129 So.2d 530 (1961)
J. Holbert ODOM, Plaintiff-Appellant,
v.
UNION PRODUCING COMPANY et al., Defendant-Appellee.
No. 9440.
Court of Appeal of Louisiana, Second Circuit.
March 10, 1961.
Rehearing Denied April 12, 1961.
Certiorari Granted May 30, 1961.
Meadors, Shaw & Meadors, Homer, for appellant.
Wilkinson, Lewis, Wilkinson & Madison, Shreveport, for appellee.
Before HARDY, AYRES and BOLIN, JJ.
*531 AYRES, Judge.
This is an action for the cancellation of an oil, gas and mineral lease, because of the expiration of its primary term without drilling or other operations having been conducted on, or production secured from, the leased premises or on lands in a unit of which the leased lands comprised a part.
The principal defense is that, during the primary term of the lease, and while it was maintained in full force and effect by the payment of delay rentals, the Commissioner of Conservation, by an appropriate order, established a drilling and production unit in which was included a portion of plaintiffs' property covered by defendant's lease; that pursuant to that order, a well had been drilled on lands in the unit although not on lands covered by this particular lease; and that said well was completed as a producer of gas and condensate during the primary term. From these facts it was contended by the lessee that the lease was maintained in full force and effect beyond its primary term as to the lands covered by the lease outside, as well as inside, the unit.
From an adverse judgment, plaintiffs appealed.
A brief résumé of the facts as relate to this particular defense is essential to an understanding and prerequisite to a discussion of the proposition submitted. On March 10, 1947, plaintiffs' ancestors in title, J. Holbert Odom and A. B. Greer, and the defendant, Union Producing Company, entered into an oil, gas and mineral lease, whereby Odom and Greer leased to the defendant the following-described property, to-wit:
South half of southeast quarter (S½ of SE¼) less ten (10) acres off the west end; south half of northeast quarter of southeast quarter (S½ of NE¼ of SE¼) and eight (8) acres described as commencing at the northwest corner of the southeast quarter of the southeast quarter (SE¼ of SE¼), Section 32, thence run west 170 yards, thence north 220 yards, thence east 170 yards, thence south 220 yards to the starting point, all in Section 32; and southwest quarter of southwest quarter (SW¼ of SW¼), Section 33; all in Township 23 north, Range 6 west, Claiborne Parish, Louisiana, consisting of 138 acres, more or less,
for a primary term of ten years from May 26, 1947, "* * * and as long thereafter as oil, gas, sulphur or other minerals or any of them is produced from said land by Lessee or the obligations in lieu of production are fulfilled."
Odom subsequently acquired the interest of Greer in the leased lands. After the institution of this action, Odom died and his heirs were made and substituted parties plaintiffs in his stead.
These lands were in the area and vicinity of Colquitt Field of Claiborne Parish. One of the sands found to be productive in that field was known as the Taylor Sand. A drilling unit of 320 acres, known as the "Tigner Unit," comprising the
South half (S½) of Section 33, Township 23 north, Range 6 west,
was created by an order of the Commissioner of Conservation, bearing No. 291-A, dated December 31, 1956, and effective January 1, 1957, which pooled and unitized the separately-owned tracts and other property interests in the unit. Included in the unit was the
Southwest quarter of southwest quarter (SW¼ of SW¼) of said Section 33,
owned by plaintiffs and covered by defendant's lease.
Pursuant to, and consistent with, the aforesaid order of the Commissioner, defendant made preparations for and spudded in a well on the northeast quarter of the southwest quarter (NE¼ of SW¼) of said *532 unit on March 4, 1957. This well was completed May 6, 1957, as a producer of gas and condensate from the Taylor Sand and was immediately shut in for lack of pipeline facilities, and remained shut in until July 27, 1957, when it was placed in production.
The rule is well established in the jurisprudence of this State that the drilling and production of oil from a unitized area constitute an exercise and user of the mineral rights throughout the entire unit and operate as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located in the unit. Delatte v. Woods, 232 La. 341, 94 So.2d 281; LeBlanc v. Haynesville Mercantile Company, Inc., 230 La. 299, 88 So.2d 377; Union Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50.
In view of the holding in the Delatte case that a shut-in well on a unit established by the Department of Conservation constituted development of the unit, plaintiffs concede that the lease, so far as it affected the southwest quarter of the southwest quarter (SW¼ of SW¼) of Section 33, was preserved by the operations conducted on the unit.
A general rule is moreover established in the jurisprudence that the obligation of a lessee under an oil and gas lease to drill a well is indivisible in its nature and that, likewise, the lessor's corresponding obligation to deliver the land is also indivisible; and that, where the obligation of one of the parties is to be fulfilled entirely, the obligation of the other must be also fulfilled in whole. Such was the observation of the Supreme Court in Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10, wherein it was held that, where an oil, gas and mineral lease covers land both within and without an integrated, consolidated, and force-pooled unit established by the Commissioner of Conservation during the primary term of the lease, and, where production in paying quantities is secured, while the lease is in effect by the payment of delay rentals, from a well within the pooled unit, but not on any portion of the leased land, such production maintains the lease in effect beyond its primary term as to that part of the land leased which lies outside the unit. See, also, LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855; Crown Central Petroleum Corporation v. Barousse, 238 La. 1013, 1022, 117 So.2d 575, 578; Smith v. Carter Oil Co., D.C., 104 F.Supp. 463.
Plaintiffs, however, contend that the aforesaid general principles are inapplicable to the facts of the instant case by reason of the language employed in the lease to the effect that any pooling or unitization of only a portion of the property leased results in a division of the lease and of its obligations.
The provisions of the lease relied upon by plaintiffs, contained in paragraph 14, read as follows:

"Lessee is hereby granted the power and right, at its option and without Lessors' joinder or further consent, at any time while this lease is in force, either before or after production, to combine and pool the lease, mineral and royalty rights in all the lands covered by this lease or any portion thereof with any other land, lands, lease, leases, mineral and royalty rights or any of them, adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation so as to create by such combination and pooling one or more drilling or production units. It is further agreed that Lessee may limit such pooling and unitization to any one or more producing horizons, and as to any one or more products, and, if limited, may extend the same from time to time as Lessee may deem advisable so as to make any such pooling and unitization apply and extend to *533 any other formation or formations, product or products, in addition to the formation or formations, product or products, originally designated, and Lessee may also declare any unit or units so as to conform to any valid rule or regulations of the Department of Conservation of the State of Louisiana touching upon or regulating that subject. Each such drilling or production unit shall not exceed 640 acres plus a tolerance not to exceed 10% of 640 acres when created for the purpose of drilling for or producing gas, distillate or condensate, or any combination of such products therefrom, and 40 acres, plus a tolerance not to exceed 10% of 40 acres when created for the purpose of drilling for or producing oil therefrom, unless the same shall be larger or smaller than the maximum drilling or production unit fixed as a basis for the development or operation of the field by the Conservation Department of the State of Louisiana, or other regulatory body, Federal or State, having jurisdiction in the premises, in which event each such unit created hereunder shall not exceed the maximum so prescribed for an in force in the field at the time such unit is created. Lessee shall execute in writing and record in the Conveyance Records of the parish or parishes in which each unit created hereunder is located an instrument identifying and describing each such unit. As between the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units, as if it were included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors' acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved. Drilling or reworking operations on or the production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all the lands covered hereby, subject to the exceptions hereinafter mentioned. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force hereunder as if such operations were on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby which is included in such pooled unit. This lease, during any period in which it is being so maintained as to any part of the land covered hereby included within any such unit, may be maintained as to the remainder in any manner elsewhere provided for herein, provided that if it be maintained by rental payment, the rentals shall be reduced to the extent of the number of acres covered by this lease and which are included in such unit or units. The Lessee may place and use on each unit created hereunder common measuring and receiving tanks for the production from such unit.
"It is agreed that as to the separately owned tracts covered by this lease the mineral rights and royalties of the Lessors hereunder are not pooled or unitized merely by virtue of the joint execution of this lease and that such mineral rights and royalties shall be deemed to be pooled or unitized only in the event and to the extent that the same are so pooled or unitized by Lessee's action as above set forth." (Emphasis supplied.)
*534 This section of the lease, as is readily discernible from its contents, relates to the power and authority of the lessee itself to combine, unitize, or pool the lease, as well as the mineral and royalty rights in all the lands covered by the lease, or any portion thereof, with lands or leases adjacent thereto.
Reliance is made by plaintiffs upon the provisions of the section hereinabove lastly emphasized. By the language employed, plaintiffs contend that the operations conducted upon, or production secured from land in any pooled unit, other than that covered by the lease, shall have effect only in maintaining the lease on such land covered by the lease as included in the pooled unit. Emphasis is laid upon the phrase, "in any pooled unit," as contemplating units formed and force-pooled by the orders of the Commissioner of Conservation, as well as units voluntarily created by the lessee under the provisions of the aforesaid section of the lease.
We are constrained to conclude that paragraph 14 of the lease applies solely and only to units voluntarily created by the lessee in the form and in the manner designated therein. No provision is contained therein relating specifically to forced units created by orders of the Commissioner of Conservation. Nor does the lease contemplate that its provisions would be applicable to such forced pooling.
If the section were given the effect as contended by the plaintiffs, additional or duplicate obligations would be imposed upon the lessee by orders of the Commissioner over and above the obligations contracted. Under the provisions of the section, the lessee was afforded the right and option of creating a unit and, thus, by its own act, of dividing the lease and its obligations. Thus, by its own affirmative acts, it may assume such additional or duplicated obligations as would normally result from a division of the lease or its obligations. These, the lessee had a right to create and assume on its own accord. We find no language warranting or justifying a conclusion that it was within the terms of the lease or within the contemplation of the parties thereto that the lease and its obligations might be divided or subdivided by the orders of the Commissioner of Conservation so as to impose, upon the lessee, without its consent, such additional burdens and obligations as would inevitably follow from the construction of the provisions of the lease as contended for by plaintiffs.
The contentions made by plaintiffs here are substantially as were made by the lessors in Smith v. Carter Oil Co., D.C., 104 F.Supp. 463, 467. While decisions of the Federal District Courts are not generally accorded by state appellate courts the weight of controlling authority, the opinion in this case is nevertheless persuasive, not only because of its logic but because its author was a distinguished Louisiana jurist, learned in the civil law. Paragraph 6 of the lease therein concerned contained provisions comparable to those contained in paragraph 14 of the lease herein involved. The plaintiff in the cited case contended the lease was divided when a unit was created by order of the Commissioner covering only a part of the property leased. In disposing of the contention made, the court observed:
"The question is not whether the lessee could have `divided' the lease, but whether the lessee did the act which the lease specifies should result in division. Practically every modern oil and gas lease has several provisions under which the lessee, at its option, may `divide' the lease; perhaps the oldest and most common is the provision that the lease may be assigned in whole or in part, and in the event of assignment as to a segregated portion of the land, default by one leasehold owner will not affect the rights of any other.
"A clause of this type was involved in Smith v. Sun Oil Company, supra *535 (165 La. 907, 116 So. 379), in which the lessee had made an assignment of the lease as to segregated acreage with reservation of an overriding royalty interest. It was urged that this was an assignment, and that the lease therefore was divided. In reply the Louisiana Supreme Court said the following:
"`The paragraph which we have quoted gave the original lessee the right to divide the lease into two or more leases, by assigning the lease on any part or parts of the 200 acres of land; and, if the assignment to Elliott was in fact and in law an assignment only, and not a sublease, the production of oil by Autrey, on the 20 acres of land, and the payment of royalties thereon, did not keep the original lease in force on the 180 acres retained under lease by the Sun Oil Company. Our opinion, however, is that the so-called assignment made by the Sun Company to Elliott was in fact and in law a sublease, and not merely an assignment, and, therefore, that the operations carried on by Autrey on the 20 acres subleased to Elliott inured to the benefit of the sublessor, and kept the lease in force on the whole 200 acres of land.' 165 La. 907, 911, 116 So. 379, 380.
"So, the question now before us is whether the lessees exercised their option by the doing of the acts specified in paragraph 6 of the lease. This paragraph specifically provides the manner in which it is to be made operative: The lessee must execute in writing and record in the conveyance records of the parish in which the land is situated an instrument identifying and describing the pooled acreage, and must mail a certified copy of this pooling designation by registered mail to the named lessor at his last known post office address.
"It is neither alleged nor contended that the lessees executed such an instrument, much less that it was recorded as required and notified in the manner specified. The plaintiff's argument is that the pooling orders of the Commissioner, secured upon application of one of the defendants with the cooperation of the other, and `acquisced in' by both, constituted an exercise of the option of paragraph 6.
"We think not. * * *."
It was, therefore, concluded that the provisions relied upon could only be brought into operation in the manner specified in the lease, that is, by the voluntary act of the lessee, which was not done, and, because of that fact, it was concluded the lease remained a single, indivisible obligation, and that the plaintiff was without right to cancel the lease as to a part of the land while leaving it in effect as to the remainder. In so holding, the court said:
"Although the lease may grant the lessee the right to divide the lease into two or more leases, affecting segregated portions of the original leased premises, upon the doing of an act solely within the power and option of the lessee pursuant to provisions of the lease, such provision does not render the lease divisible unless and until the contemplated act is done by the lessee. Smith v. Sun Oil Co., supra (165 La. 907, 922, 116 So. 379, 384-385). The lessee here did not execute and record a pooling designation and notify the lessor by a certified copy thereof through registered mail, as required by Paragraph 6 if the lessee is to exercise its option thereunder.
"Issuance of a pooling order by the Commissioner of Conservation of the state of Louisiana does not constitute a `division' of the indivisible obligation of the lease, and the lessor may not sue to cancel the portion of the leased premises lying outside the unit. Hunter Co., Inc. v. Shell Oil Co., Inc., supra; LeBlanc v. Danciger Oil & Refining *536 Co., supra; Cf. Scott v. Pure Oil Company, 5 Cir., 1952, 194 F.2d 393."
Plaintiffs contend, however, that, if the phrase "any pooled unit" is not expressly inclusive of forced units, then the language is ambiguous and, since the lease was specifically prepared by the lessee, such ambiguity must be construed against it and in favor of the lessor. There is no question of the correctness of the legal principle involved but, while excerpts from paragraph 14 of the lease might appear to be misleading when taken out of context, such is not the case when the section is considered as a whole. In giving consideration to all the provisions of the section, it becomes evident that the entire section relates solely to voluntary units and not force-pooled units by actions of the Commissioner of Conservation. The effects of such voluntary unitization do not extend to a unit pooled by orders of the Commissioner.
From this, we conclude the lease was continued in force and effect as to the lands covered thereby although not included within the unit, subject, of course, to the other appropriate provisions of the lease.
Nevertheless, plaintiffs contend, and indeed defendant concedes, that subsequent to the formation and creation by the Commissioner of the unit comprising the south half of Section 33, the defendant, as lessee, did, in fact, in accordance with the aforesaid provisions of paragraph 14 of the lease, voluntarily unitize plaintiffs' property located in Section 32 with other lands and leases whereby that portion of the leased lands included in the forced unit was divided and segregated from the remainder of the leased property, or vice versa, and that such action resulted in a division of the lease and a division of the lessee's obligations thereunder. Based upon this fact, plaintiffs' position is that, after the formation and creation of this voluntary unit, the lessee could no longer rely upon the existence of, or the operations conducted on, or the production secured from the aforesaid forced unit in order to preserve and extend the lease beyond its primary term as to the lands not included within the force-pooled unit.
The facts bearing upon this contention may be briefly stated. The lessee, by instrument dated May 15, 1957, and filed for record May 20, 1957, and as corrected by an instrument relating to an immaterial error in description dated and filed for record May 23, 1957, denominated a "Declaration of Unitization," voluntarily pooled and unitized, in accordance with the aforesaid provisions of paragraph 14 of the lease, the following-described property, to-wit:
East half of northeast quarter and the southeast quarter (E½ of NE¼ and the SE¼), less the west ten (10) acres of the southwest quarter of the southeast quarter (SW¼ of SE¼), Section 32, Township 23 north, Range 6 west, comprising 230 acres more or less.
This position of plaintiffs is, in our opinion, well taken as the provisions of the lease relating to voluntary pooling by the lessee contemplate that operations on, or production from, the voluntary unit shall only extend to the leased lands included in that unit and shall have no effect as to other of the leased premises not included therein. The provisions likewise contemplate that operations on or production from any part of the leased premises not included in the unit shall have no effect on the leased lands included in the unit. It may be appropriate to point out that under paragraph 14 of the lease the effect of operations or production from a voluntary unit "* * * shall be limited to the land covered hereby which is included in such pooled unit."
Therefore, we conclude and hold that the effect of the forced unitization of a portion of the leased lands, so far as maintaining the lease in force and effect as to the leased lands not included within the forced unit, extended only to May 20, 1957, when the voluntary unit was created and became *537 effective, as, on that date, by the action of the lessee undertaken in accordance with the provisions of paragraph 14, the leased property was divided and segregated and the lease and its obligations divided. Thus, as to plaintiffs' lands covered by defendant's lease, located in Section 32, the preservation of the lease beyond its primary term, expiring with May 26, 1957, depended upon whatever operations were conducted on or production secured from said leased lands or on lands in a unit of which plaintiffs' lands comprised a part before the expiration of the primary term of the lease.
The facts relating to the questions thus presented are as follows: Under date of February 27, 1957, lessee commenced operations for the drilling of a well on the
Southeast quarter of the northeast quarter (SE¼ of NE¼), Section 32, Township 23 north, Range 6 west,
known as the Tigner property. This well was spudded in March 3, 1957, and completed as a producer of gas May 1, 1957. The well was then immediately shut in and remained so until July 27, 1957, when it was placed in production. Thus, the record establishes that no operations were conducted on plaintiffs' property or on lands in a unit of which it formed a part, as all such activities were conducted and completed before the formation of the unit. Nor was production secured from plaintiffs' land or from land in a unit with which plaintiffs' property had been unitized as production had been secured from the adjacent property before the unit was formed.
Appropriate to this factual situation are these provisions which we again quote from paragraph 14 of the lease:
"Drilling or reworking operations on or the production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all the lands covered hereby, subject to the exceptions hereinafter mentioned. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force hereunder as if such operations were on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby which is included in such pooled unit." (Emphasis supplied.)
It will be noted from the résumé of facts hereinabove made, there were no operations conducted on or production secured from the leased lands, or on or from land in a unit of which plaintiffs' lands then comprised a part, as all the operations and activities conducted by the lessee on the adjacent property were prior to the creation of the unit.
A similar factual situation was before the Supreme Court in Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416, 419, 420. In that case, the lease for which plaintiffs sought cancellation was dated September 3, 1948, had a primary term of five years, and provided for a yearly delay rental for the privilege of deferring drilling operations for a period of 12 months. No well was drilled by the lessee on the leased property, nor was payment made of the delay rentals for the privilege of deferring operations beyond September 3, 1952. The lessee contended that the lease, however, was maintained in effect because there was, on the rental payment date, a producing well on a unit formed under the terms of the lease of which 20 acres of plaintiffs' property was a part, and that this production maintained the lease in force. The lessors contended that the production from that well could not keep the lease in effect because the unit was formed after production was obtained and the well was not commenced or completed on the unit and, therefore, that this production could not be considered as production from plaintiffs' lands. Solution of the problem presented required an interpretation of the provisions of the *538 lease. Of primary importance was the provision that
"The commencement of a well or the completion of a well to production, and the production of oil or gas therefrom, on any portion of an operating unit in which all or any part of the land described herein is embraced shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease."
In resolving the issue thus presented, the court stated:
"The operations on the unit of which lessors' land is a part, but not on their lands contained in the unit, which have the same force and effect as if conducted on the lands described in the lease are:

"(1) Commencement of a well on the unit, or (2) completion of a well to production on the unit, or (3) production from a well completed to production on the unit.

"In the instant case it will be recalled that the well drilled on the Breaux land was commenced on May 4, 1952, completed to production in the FT sand on August 6, 1952, and the unit was formed on August 25, 1952, and filed for record on September 2, 1952. This well therefore was (1) not commenced on this unit, (2) not completed to production on this unit, and (3) production was not from a well completed to production on this unit, because each of these operations took place prior to the existence or establishment of the operating unit. Consequently, under the provisions of the lease, not one of these operations can be considered to have the same force and effect as if conducted on the land of the Wilcoxes, the lessors. The production relied upon by Shell to keep the lease in force, therefore, cannot be considered as if it were production on the Wilcox land because for production from the unit to be considered production from the Wilcox lease it would have to be from a well completed to production on the unit. Thus, although there was a producing well on the unit on the rental date, that well was completed to production before the unit was formed, and production from it is not considered as production from the Wilcox lease.
"This answers Shell's contention that production obtained from the Breaux well by lessee in the FT sand prior to September 3, 1952, relieved it from the payment of the delay rental to the lessors under Section 6 of the lease, which provides that lessee will be relieved of delay rental payments if production is being had from the leased premises or from an operating unit. This production from the well drilled on the Breaux lands did not have the same force and effect as if it had been obtained on the the Wilcox property because it was production obtained from a well completed to production prior to the formation of the operating unit."

Defendant would, however, distinguish the Wilcox case from the instant one in that the lease here specifically provides that the voluntary unitization might be effected either before or after production. This is a distinction without a difference, for the terms of the lease contract relating to the preservation of the lease are substantially the same in both cases. In this case, as heretofore pointed out, the continuance of the lease beyond its primary term depended upon operations conducted on or production secured from the leased property, or from land in a unit of which it formed a part, neither of which was done as there were neither operations conducted on nor production secured from either the leased land, or lands, of the unit after formation of the unit and prior to the expiration of defendant's lease.
Moreover, under the provisions of paragraph 2 of the lease, it was contemplated *539 that the lease could only be maintained in force beyond its primary term by either actual production or constructive production for it was therein stipulated that the lease would remain in force for the primary term "and as long thereafter as oil, gas, sulphur or other minerals or any of them is produced from said land by Lessee or the obligations in lieu of production are fulfilled." (Emphasis supplied.)
The obligations in lieu of production are the payments of "shut-in royalty" as provided in paragraph 7 of the lease$200 per year, payable quarterly. The paragraph then provides "* * * and so long as such lieu royalty is paid said well or wells shall be considered wells producing gas in paying quantities under Paragraph 2 hereof." (Emphasis supplied.)
In this connection, it may be pointed out that although the well was completed and shut in May 1, 1957, and notwithstanding that defendant's lease expired with May 26, 1957, no payment of such lieu royalty was made or tendered before the expiration of the primary term of the lease. Therefore, under the very terms of the lease, there was neither actual production nor constructive production to maintain the lease in force beyond its primary term.
The lessee makes the further contention that, under date of July 30, 1957, by Order 291-A-1, filed for record August 2, 1957, and effective as of August 1, 1957, the Commissioner of Conservation unitized the whole of the east half (E½) of Section 32, Township 23 north, Range 6 west, which unit included plaintiffs' 98 acres not theretofore included in the former unit comprising the south half (S½) of Section 33, as well as the remainder of the 230 acres voluntarily unitized by the lessee. This contention may be considered as abandoned inasmuch as it has not been urged on this appeal. Nevertheless, it appears wholly without merit, as, obviously, the action of the Commissioner of Conservation, taken after a lease has expired, could not have the effect of reinstating or resurrecting a lease which had already terminated. Broussard v. Phillips Petroleum Co., D.C., 160 F.Supp. 905; 34 Tulane Law Review, 445-446.
In addition to the cancellation of the lease, insofar as it affects plaintiffs' land in Section 32, plaintiffs seek to recover of the defendant reasonable attorney's fees in accordance with the provisions of LSA-R.S. 30:102. However, attention is directed to the fact that this suit was instituted for the cancellation of the aforesaid lease in its entirety and that the suit was predicated upon a demand made therefor. The plaintiffs concede, as heretofore pointed out, that the lease has been preserved so far as concerns 40 acres of the 138 acres involved. The cancellation can, therefore, be only partial. On this point, the latest expression of the Supreme Court appears to have been made in the case of Leaderbrand and Hardy v. Shallow Oil Company, 234 La. 796, 101 So.2d 673, 675, wherein the court stated:
"The lower court properly denied the plaintiffs' claim for attorney's fees in this case. The plaintiffs rely on Wier v. Grubb, 228 La. 254, 82 So.2d 1; Nunley v. Shell Oil Company, 229 La. 349, 86 So.2d 62 and R.S. 30:102.
"LSA-R.S. 30:102 in regard to attorney's fees provides: `If a lessee, having been given written notice demanding cancellation of the lease, fails or refuses to comply within ten days, he shall be liable to the lessor for a reasonable attorney's fee incurred by the lessor in bringing suit to have the cancellation adjudged.'
"Although the record does not show that any written demand was made on the defendant for the cancellation of its sublease, if such demand was made it was for the cancellation of the entire lease. If we concede therefore that a demand was made before the filing of this suit, it must have been for the cancellation of the entire sublease. It is true that attorney's fees were allowed *540 in the case of Nunley v. Shell Oil Company, supra, but an examination of that case reveals that only partial cancellation was sought and granted. This is also true of Wier v. Grubb, supra. Herein plaintiffs sought entire cancellation and were only successful in partial cancellation hence the claim for attorney's fees was properly rejected."
See, also, 19 L.L.R. 328. Hence, no allowance can be made for plaintiffs' attorney's fees.
The Supreme Court also held, in the Leaderbrand case, that, where plaintiffs sought the entire cancellation of oil, gas and mineral leases and were only successful in partial cancellation, the costs should be equally divided between the parties.
Accordingly, for the reasons herein assigned, the judgment appealed is annulled, avoided, reversed and set aside, and
It is now ordered, adjudged and decreed there be judgment herein in favor of the plaintiffs, H. G. Odom, J. O. Odom, Julia Odom, R. D. Odom, William G. Odom, Mrs. Virginia Cline, nee Odom, Mrs. Bessie Rowe, nee Odom, Mrs. Sybil Hollenbeck, nee Odom, and Mildred Odom, individually and as curatrix of the interdict, Mrs. Mary Elizabeth Odom, and against the defendant, Union Producing Company, ordering and directing the cancellation and erasure of that certain oil, gas and mineral lease dated March 10, 1947, executed by and between J. H. Odom and A. B. Greer, as lessors, and the Union Producing Company, as lessee, and as recorded in Book 159, page 327 et seq., of the Conveyance Records of Claiborne Parish, Louisiana, and as amended by an agreement between J. H. Odom and Union Producing Company under date of April 25, 1955, as recorded in Book 212, page 525, of the Conveyance Records of Claiborne Parish, Louisiana, so far as, and only insofar as, the same affects and covers the following-described property, to-wit:
South half of southeast quarter (S½ of SE¼) less ten (10) acres off the west end; south half of northeast quarter of southeast quarter (S½ of NE¼ of SE¼) and eight (8) acres described as commencing at the northwest corner of the southeast quarter of the southeast quarter (SE¼ of SE¼), Section 32, thence run west 170 yards, thence north 220 yards, thence east 170 yards, thence south 220 yards to the starting point, all in Section 32, Township 23 north, Range 6 west, Claiborne Parish, Louisiana, consisting of 98 acres, more or less, and particularly as concerns the oil, gas and minerals described therein. It is further ordered, adjudged and decreed that the costs be paid one-half by the plaintiffs and one-half by the defendant.
Reversed and rendered.