J. W. BENNETT et al., Appellants,

v.

**SINCLAIR OIL & GAS COMPANY,**
Appellee.

No. 25962.

United States Court of Appeals
Fifth Circuit.

Dec. 26, 1968.

———◆———

Robert J. Moffatt, Simon Herold, Shreveport, La., for appellants.

Frank S. Kennedy, Naff, Kennedy, Goodman & Johns, Shreveport, La., for appellee.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

AINSWORTH, Circuit Judge:

In this diversity suit plaintiffs (appellants) sued to cancel three Louisiana mineral leases on the ground that defendant (appellee), owner of the leases, failed to pay royalties or shut-in royalties in accordance with the terms of the lease, or failed to drill and produce the leased property within the primary term of the leases; further, that defendant failed to protect plaintiffs' property from drainage. Alternatively, plaintiffs sought partial cancellation of the leases. The case was tried before the District Court without a jury and resulted in a judgment for defendant from which plaintiffs have appealed. We affirm.

All of the mineral leases pertain to contiguous lands in Jackson Parish, Louisiana, in Township 17 North, Range 1 West. R. D. Bennett executed an oil, gas and mineral lease with the usual standard clauses,[1] on May 19, 1960, for a primary term of 5 years, covering the W ½ of SE ¼, less 5 acres in the NE corner of Section 5, containing 75 acres, the lease being hereafter referred to as Lease No. 1.

Two other leases on substantially identical terms and for primary terms of 5 years were made. J. W. Bennett executed a mineral lease on August 25, 1960, hereafter referred to as Lease No. 2, covering the W ½ of NE ¼ and NW ¼ and N ½ of SW ¼, Section 4, containing 320 acres; also, a mineral lease was executed by J. W. Bennett dated August 25, 1960, hereafter referred to as Lease No. 3, covering the E ½ of SE ¼, 5 acres in the NE corner of NW ¼ of SE ¼, E ½ of NE ¼ and SW ¼ of NE ¼, Section 5, containing 205 acres.

Plaintiffs claim that Lease No. 1 lapsed for failure to pay royalties or shut-in royalties, as provided by the terms of the lease, after the primary term expired on May 19, 1965. On the other hand, defendant contends that Lease No. 1 is still in force and effect in its entirety; that it was held in force during its primary term by proper payment of delay rentals; that it was held in force thereafter by being in the Sinclair-J. W. Bennett Unit established by Louisiana Conservation Commissioner's Order No. 397–B–11 dated May 12, 1965, effective May 11, 1965, on which unit a well was spudded by defendant on April 14, 1965, and completed as a commercial producer on May 29, 1965. Further, that shut-in royalties were tendered to plaintiff until the time when a part of the lease was included in the Cadeville Sand Unit, Calhoun Field, by Louisiana Conservation Commissioner's Order No. 397–B–10e dated October 20, 1965, effective November 1, 1965, and that since the latter date the lease has been kept in force by production from the Cadeville Sand Fieldwide Unit and tender of royalty due plaintiffs.

Plaintiffs claim that Lease No. 2 lapsed on August 25, 1965, the expiration of the primary term of the lease, because no well was drilled on the lease and no shut-in royalty was paid. They further claim that Lease No. 3 also lapsed on August 25, 1965, the expiration of the primary term of that lease, because the well drilled thereon was shut in

---

1. The standard clauses are listed in the District Judge's written opinion as the Habendum Clause, the Shut-in Royalty Clause, the Regular Royalty Clause, the Delay Rental Clause, and a "Pugh" Clause.

at the expiration of the primary term and no shut-in royalties were thereafter paid. Plaintiffs alternatively claim that Lease No. 2 and Lease No. 3 lapsed as to all of that acreage not included in the Cadeville Sand Unit. On the other hand, defendant contends that Lease No. 2 and Lease No. 3 are still in force in their entirety and were maintained by proper payment of delay rentals during the primary term until portions thereof were included in the Cadeville Sand Unit by a forced unitization order of the Louisiana Conservation Commissioner; that these leases have thereafter been maintained by proper tender of royalty from production in the Cadeville Sand Unit.

There is no dispute that delay rentals during the primary term of the leases were paid as follows:

Lease No. 1 for the entire 5-year primary term and Leases Nos. 2 and 3 for the first 3 years of the primary term. Nor is it disputed that delay rentals were also tendered for Leases Nos. 2 and 3 after parts of said leases had been included in a compulsory drilling unit of the Louisiana Conservation Commissioner—but only as to that acreage not included in the drilling unit.

Further chronological detail is necessary. The Cadeville Sand Unit grew out of a fieldwide unitization by the Louisiana Conservation Commissioner of the Calhoun Field situated in Ouachita, Lincoln and Jackson Parishes, Louisiana. Insofar as is pertinent here, the Conservation Commissioner's Order No. 397–B–10a effective December 1, 1962, pooled and unitized the then known Cadeville Sand in the Calhoun Field, and included small portions of the lands described in Leases Nos. 2 and 3. The Commissioner's order of February 1, 1965, enlarged the Cadeville Unit and included additional acreage in Leases Nos. 2 and 3. (See La.R.S. 30:1 et seq. for the Louisiana statutory provisions relating to the Commissioner's regulatory authority in this regard.) No portion of Lease No. 1 had at this time been included in the fieldwide Cadeville Unit by any order of the Louisiana Conservation Commissioner.

Pursuant to the request of defendant Sinclair for an emergency hearing for the establishment of a new unit (the Sinclair-J. W. Bennett Unit), the Louisiana Conservation Commissioner issued his Order No. 397–B–11, to which we have referred and which was effective as of May 11, 1965. In this 320–acre unit was included all of the lands in Lease No. 1 and portions of the lands in Leases Nos. 2 and 3, none of said acreage being included in the then limits of the Cadeville Sand Unit. The principal purpose by Sinclair was to maintain Lease No. 1 beyond its primary term. However, Sinclair, without waiting for the issuance of the Commissioner's order, spudded the unit well on Lease No. 3 on April 14, 1965, and it was completed on May 29, 1965 (though the work report filed with the Conservation Commissioner showed the completion date to be June 13, 1965). The well was then shut in, and on August 19, 1965, defendant Sinclair tendered shut-in royalty to plaintiffs, designated to be applicable to Lease No. 1, but no shut-in royalty was tendered or paid for Leases Nos. 2 and 3.

The Louisiana Conservation Commissioner's Order No. 397–B–10e issued on October 20, 1965, effective November 1, 1965, again enlarged the Cadeville Sand Unit of the Calhoun Field and included additional acreage in Leases Nos. 2 and 3 as well as a substantial portion of Lease No. 1. Acreage in Lease No. 1 had not previously been unitized by the Conservation Commissioner in the Cadeville Sand Unit.

As to Lease No. 1, the critical date is May 19, 1965, the expiration date of the primary term of the lease. At that time all of Lease No. 1 was included in the new Sinclair-J. W. Bennett Unit established by the Louisiana Conservation Commissioner. After a commercial well was ultimately completed in the unit on May 29, 1965, or on June 13, 1965, the completion date filed with the Conservation Commissioner, the question arises as to whether proper shut-in royalties in ac-

ordance with the terms of the lease were then tendered to plaintiffs. If so, the lease was held in full force and effect until a substantial portion thereof was included by the Louisiana Conservation Commissioner in the Cadeville Sand Unit by his order which became effective November 1, 1965.[2]

■ Plaintiffs declined to cash defendant's check for $17.43 tendered on August 19, 1965, for shut-in royalties on Lease No. 1 on the ground that they were not paid in accordance with the terms of the lease in that the check was an erroneous payment for a 6-month period instead of quarterly as provided by the lease,[3] and, further, that the payment was premature because it was designated for a period beginning May 29, 1965, when the actual well completion date was June 13, 1965. The District Judge held—and we agree with his finding—that the completion date involved a mere technicality as to whether the completion occurred when the "Christmas tree" was installed or when the liner in the well was perforated. Though ordinarily shut-in royalties should be tendered in accordance with the terms of the leases, there is no showing of prejudice or injury under the circumstances and plaintiffs should not be permitted to cancel Lease No. 1 where there was a small overpayment of such royalties. In view of the inclusion of a substantial portion of Lease No. 1 by the Commissioner's order effective November 1, 1965, no further shut-in royalties were thereafter due as to this lease. Thus, if lessors were paid for a 6-month period

when at best, under the circumstances, only a 3-month (quarterly) payment was due and would be due, it is evident that no harm or prejudice has been done, and the amount of overpayment is inconsequential and unavailing to appellants' contention. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957), cited by appellants, is not apposite. In that case defendant Texas Company failed to pay production royalties actually due on a producing well (though numerous demands in conferences with defendant's representatives were made but were apparently refused because the defendant Texas Company was attempting by withholding payment to obtain a favorable amendment to its mineral lease with lessor), even though shut-in royalties paid actually exceeded production royalties due. Cf. Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956).

As to Leases Nos. 2 and 3, plaintiffs contend that they expired after the termination of their primary term, even though a commercial well was completed and shut in on the Sinclair-J. W. Bennett Unit which covered all of Lease No. 1 and portions of Leases Nos. 2 and 3, because no shut-in royalty was then paid applicable to Leases Nos. 2 and 3. It is obvious from appellants' argument that their suit is more directly concerned with the cancellation of that portion of Leases Nos. 2 and 3 lying within the Sinclair-J. W. Bennett Unit on which no shut-in royalties were paid by defendant Sinclair. Plaintiffs contend that when defendant Sinclair requested an emergency

2. The Trial Court's holding that the November 1, 1965, effective order fixed the respective position of the parties with reference to the unitized lands is not erroneous, as contended by appellants. Obviously the order can have no ex post facto effect upon the rights and obligations of the parties as of the end of the primary terms of the leases. But the new order which enlarged the Cadeville Sand Unit to include Lease No. 1 for the first time, and a substantial part thereof, thus rendered it unnecessary to pay further shut-in royalties on that lease since it was now held by production, being a part of the

Cadeville Fieldwide Unit, and no shut-in royalties were due appellants for the second quarter.

3. " '3. The royalties to be paid by Lessee are: * * * (c) where gas from a well producing gas only is not sold or used because of no market or demand therefor, Lessee may pay as royalty $50.00 per well, per year, *payable quarterly*, and upon such payment it will be considered that gas is being produced within the meaning of article 2 of this contract.' " (Emphasis supplied.)

hearing and obtained a Louisiana Conservation Commissioner's order unitizing lands in Leases Nos. 1, 2 and 3 in the Sinclair-J. W. Bennett Unit, defendant Sinclair thereby divided the leases into two separate units and that it could no longer rely on the fact that part of Leases Nos. 2 and 3 were in the Cadeville Sand Fieldwide Unit to maintain the acreage in the "separate and distinct" Bennett Unit. There is no doubt that all of Leases Nos. 2 and 3 were held by production by portions thereof being included in the Cadeville Sand Unit prior to the expiration of the primary term of the leases and prior to the establishment of the Sinclair-J. W. Bennett Unit by the Louisiana Conservation Commissioner's order effective May 11, 1965.[4]

In Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947), the Louisiana Supreme Court held that the lessee's obligation to drill a well is indivisible and the obligation is to be fulfilled entirely and in whole. Thus the court held that where no well had been drilled on any part of the land covered by the lease, but prior to expiration of the primary term a commercial well was completed on land other than that covered by the lease but which was forcepooled (by Louisiana Conservation Commissioner order) in a unit of which the leased premises formed a part, since the obligation of the lease was not divided, it would be considered that production was being obtained from the entire leased premises, including that part lying outside of the unit, sufficient to prevent expiration of the lease at the end of its primary term. The court specifically held that orders of the Louisiana Conservation Commissioner did not divide the lease or the obligation under the lease—the effect of which holding by the Louisiana Supreme Court is to reject appellants' separate obligation theory in the present case.

The holding in *Hunter Co.* was subsequently cited with approval by the Louisiana Supreme Court in LeBlanc v. Danciger Oil & Refining Co., 218 La. 461, 49 So.2d 855 (1950). See also Odom v. Union Producing Company, La.App., 2 Cir., 129 So.2d 530 (1961), reversed on other grounds, 243 La. 48, 141 So.2d 649 (1962); Smith v. Carter Oil Co., W.D. La., 1952, 104 F.Supp. 463.

Plaintiffs cite Sellers v. Continental Oil Company, La.App., 3 Cir., 168 So.2d 435 (1964), and Fontenot v. Sunray Mid-Continent Oil Company, La.App., 3 Cir., 197 So.2d 715 (1967), cert. refused by Louisiana Supreme Court, 250 La. 898, 199 So.2d 915 (1967). Neither of these cases is applicable on their stated facts. The failure of the lease holders to pay production royalties for a period of 30 months in *Fontenot* and 33 months in *Sellers*, without explanation for the delay, was the specified reason for decision in those cases cancelling the leases based on an active breach of the conditions thereof. No such factual situation exists in the instant case. In the *Sellers* case, supra, there was an original mineral lease of 121.46 acres, on a contiguous tract, but as the result of partial releases by the lessee, the acreage was reduced to two noncontiguous tracts of 11.-28 acres and 12.218 acres, respectively. Royalties were not paid on the production attributable to the 12.218-acre tract from October 1957, beginning date of production, until June 1960 when their tender was refused. Production royalties, however, were timely paid on the 11.28-acre tract. The Louisiana court held, "Under the facts of this case, there having been full payment of royalty due the plaintiffs from the 11.28 acre tract, we find that cancellation of the lease as to this tract was inappropriate."

*Fontenot*, supra, also involved a failure to pay production royalties (for 30

---

4. Appellants concede as much in their brief (p. 14) where they state,

"This would be a difficult issue for the Court if Sinclair had not sought the establishment of the J. W. Bennett Unit they might have relied upon the small amounts of production to which the Bennetts were entitled from the acreage included in the Calhoun fieldwide unit to perpetuate defendant's lease rights.'

months) without any satisfactory explanation for the oil company defendant to do so. The Louisiana court granted cancellation of the lease for this active breach of the lease contract but not as to that portion of the lease mineral interest on which the company did not breach its lease obligations.

The cited cases are of little value, therefore, in a decision on the present controversy which involves a totally different factual situation. No question exists here about a failure to pay production royalties.

The three leases involved in this case contain a Habendum Clause which provides in each that the lease shall be for a primary term of 5 years "and as long thereafter as oil, gas or other mineral is produced from said lands or land with which said land is pooled hereunder." Portions of Leases Nos. 2 and 3 were included in the Cadeville Sand Unit as early as December 1, 1962, and larger parts thereof by subsequent Louisiana Conservation orders of December 1, 1963, and February 1, 1965. Shut-in royalties were, therefore, not due to plaintiffs on Leases Nos. 2 and 3, the entirety of which were held by production by parts of each being included in the Cadeville Sand Unit. Where there is actual production attributable to a mineral lease, as there was in the present case by inclusion of portions of Leases Nos. 2 and 3 in the Cadeville Sand Unit, there is no obligation to pay shut-in royalties in the event another commercial well capable of producing in paying quantities but shut in, is drilled on the leased premises.[5] See Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332 (1962); Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615 (1952). Nor is Broussard v. Phillips Petroleum Corporation, W.D.La., 1958, 160 F.Supp. 905, cited by appellants, applicable on its facts, where dividing a lease which contained a "Pugh" Clause,[6] was upheld in a case involving a voluntary unitization as opposed to the compulsory unitization which was ordered here in the Cadeville Sand fieldwide pooling. The so-called "Pugh" Clause does not divide the lease in a case such as this, which involves a compulsory unitization by orders of the Louisiana Conservation Commissioner. Smith v. Carter Oil Co., W.D.La., 1952, 104 F.Supp. 463, cited with approval in Odom v. Union Producing Company, La.App., 2 Cir., 129 So.2d 530 (1961), reversed on other grounds by the Louisiana Supreme Court, 243 La. 48, 141 So.2d 649 (1962).

5. This is undoubtedly what the Trial Judge meant by the use of a hypothet in his written opinion to which appellants take serious exception. A reading of the opinion as a whole shows that the District Judge had a clear grasp of all the facts. Only one well was drilled on the Sinclair-J. W. Bennett Unit. The hypothet was designed to show that once mineral leases are held in a compulsory drilling unit by a well off the leased premises but located within the unit, the drilling of another well within the unit but on the leased premises, but shut in for appropriate reasons, does not give rise to an additional obligation to pay shut-in royalties. In the present case, we have considered the legal effect of wells drilled within the Cadeville Unit but not on the leased premises of which parts are contained in said unit, as against the alleged obligation to pay shut-in royalties when a well is produced on the leased premises (already held by production in the fieldwide unit) but in a separate unit. Our holding is that the obligation to drill is satisfied by leases being contained in part in the fieldwide unit. The well-considered, detailed opinion of the District Judge convinces us that he was well conversant with both the facts and law of the case.

6. The so-called "Pugh" Clause in the leases under consideration reads in pertinent part as follows:
"'6. * * * If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or such production from land covered hereby, *except that its effect shall be limited to the land covered hereby which is included in such pooled unit.*'" (Emphasis supplied.)

The Trial Court held on the evidence that appellants were not entitled to damages for drainage because there was no notice (or putting in default) by them to defendant Sinclair and because the continuous re-evaluation of the pertinent geological data of that area by the Louisiana Conservation Commissioner resulted in enlargements of the Cadeville Sand Fieldwide Unit from time to time in which additional acreage of plaintiffs in these leases was included. Appellants' case in this regard is inconclusive, and we see no reason to disturb the District Court's findings, which are not clearly erroneous. See Fed.R.Civ.P. Rule 52(a).

Affirmed.