HAMLIN, Justice.
This action was brought for the cancellation of an oil, gas, and mineral lease covering certain described lands in Sections Thirty-Two and Thirty-Three, Township Twenty-Three North, Range Six West, Claiborne Parish. From a judgment of the trial court rejecting their demands at their costs, plaintiffs appealed to the Court of Appeal, Second Circuit; they acquiesced in that part of the judgment of the trial court affecting Section Thirty-Three, but *51 they pursued their appeal with respect to Section Thirty-Two. The Court of Appeal ordered the cancellation of the lease, insofar as it bore upon Section Thirty-Two. In the exercise of our supervisory control (Art. VII, Sec. 11, La.Const.l921-LSA), we directed certiorari to said Court of Ap-i peal for review of its judgment.
The following plat, copied from the Appendix of relator’s brief, shows the sections involved in this litigation and the wells; thereon.

The facts of record are ably recited by the Court of Appeal in its opinion (129 So.2d 530), and only those necessary for our decision will be reiterated.
On March 10, 1947, plaintiff J. Holbert Odom (he died after filing the present action, and his heirs were substituted as parties plaintiff) and A. B. Greer (Odoni later acquired Greer’s interest in the land),, lessors, and Union Producing Company,, lessee, executed an oil, gas, and mineral' lease (La. 14 A Rev. with Pooling Provision 1M 4-46, prepared by Union Producing Company for its use in this area and furnished by said company), covering approximately one hundred and thirty-eight (138) *53 -acres in Claiborne Parish, for a- primary-term of ten years from May 26, 1947[1] and • as long thereafter as oil, gas, sulphur or other minerals or any of them were produced from the land by the lessee or the •obligations in lieu of production were fulfilled. The plat, supra, shows that ninety-•eight acres of the Odom property were lo-cated in Section Thirty-Two and forty .acres were located in Section Thirty-Three.
On December 31, 1956, effective from and after January 1, 1957, the Commissioner of Conservation of the State of Louisiana issued Order #291-A, establishing •drilling units for the Taylor Sand of the •Colquitt Field of Claiborne Parish. One •of the units so established by the order was the South Half (S/2) of Section 33, Township 23 North, Range 6 West, containing ■320 acres, more or less, in Claiborne Parish, Louisiana, known as Union Producing ■Company et al. Tigner Unit. This unit in•cluded forty acres covered by the aforementioned lease, being the SW/4 of the •SW/4 of Section 33. Production was secured on this unit but not on plaintiff’s land; the well was spudded in on March 4, 1957, and drilling continued thereafter until it was plugged back and completed on May 6, 1957 in the Taylor Sand as ¿'producer of gas with associated liquid hydrocarbons. The well was then shut' in, but it was thereafter placed on production on July 27, 1957.[2] In view of the holding of Delatte v. Woods, 232 La. 341, 94 So.2d 281, plaintiffs conceded that the lease, insofar as it affected the SWJ4 of SWi4'.of Section 33, was preserved by the operation on this unit. 1 ' ’
Preparations for the drilling of Union Producing Company et al. Tigner Unit No. A-l Well, located in the SE/4 of NF/4 of Section 32, Township 23 North, Range 6 West, were commenced on February 27, 1957; the well was spudded in on March 3, 1957, and drilling continued thereafter with due diligence until the well was drilled to a total depth of 9030 feet, whereupon it was plugged back and completed as producer of gas and associated liquid hydrocarbons in the Taylor Sand. The Tigner No. A-l Well was shut in but was thereafter connected to Arkansas Louisiana Gas Company’s pipe line on July 27, 1957, when production was commenced. By an instrument dated May 15, 1957, filed for Registry on May 20, 1957, Union Producing Company filed a declaration of unitization, des *55 ignating a unit containing 230 acres. This acreage embraced the lands of plaintiffs located in Section 32; the Tigner No. A-l Well was not situated on their property.[3] On June 11, 1957, Union Producing Company wrote to Mr. J. H. Odom, informing him that a check for $21.30 was enclosed,[4] being full payment of shut-in royalty for the period from April 24, 1957 to July 24, 1957, Tigner “A” Unit Well No. 1, located in the NEJ4 of Section 32.
On May 27, 1957, attorneys for J. H. Odom wrote to Union Producing Company demanding a release of the lease, alleging that it had expired under its own terms and that the demand was being made in accordance with LSA-R.S. 30:102.
In á reply of June 7, 1957, Union Producing Company stated, “All of the land covered by this lease, which is located in Section 33, Township 23 North, Range 6 West, is included in a forced unit created by the Department of Conservation on December 31, 1956, by its Order No. 291-A of that date. All of the land covered by this lease and located in Section 32, Township 23 North, Range 6 West, is included in a voluntary unit declared on May 15, 1957, as amended by instrument dated May 23, 1957, both the original unit declaration and the amended declaration having been executed pursuant to the provisions of the said lease.”
After a further exchange of correspondence, in which Union Producing Company declined to surrender the lease, the present, action was filed on July 29, 1957.
Plaintiff contended that the lease expired' by its own terms as to the land located in. Section 32 because this portion of the lease-was severed from the remainder when the land in Section 33 was placed in a pooled;' unit, which we shall designate as the Conservation Unit. Conceding that the 'decision of Delatte v. Woods, supra, had' the effect of keeping in force and effect - the-lease as to the portion of the land in Section 33, plaintiff contended that the lease-was divided and that anything outside the-Conservation Unit—even though it fell within the lease—was not so affected. Plaintiff relied on Paragraph 14 of the lease, which shall be quoted infra. Plaintiff argued that the Tigner Unit No. A-l Well,, which we shall hereinafter designate as-being in the voluntary unit, was not equivalent to production within the primary term of the lease.
The trial court stated that it understood the law to be that “the production in the-unit well in which the lands leased in Sec. 32 are located was a sufficient compliance-with the terms of the lease and of the legal requirements to keep all property within the-unit in position to share the fruits from that unit; but, previous to that, the produc *57 tion on the unit which included the leased lands in Sec. 33 had the effect of keeping the lease itself in full force and effect.”
In speaking of the voluntary unit, the trial court stated that its holding would be different in this case “if it were brought to the attention of the Court that what is called a producing well on a unit is not an actual fact, and that the payment of shut-in royalties is a mere subterfuge for the purpose of holding the lease in force.” The trial court further said that its failure to follow the logic of plaintiff’s position was due to the fact that “we have the conviction that there are several premises on which the plaintiff’s position is based, which we believe are erroneous. The first is that the termination of the primary term of the lease in question in the instant case is the date of the lease, or March 10, 1957, whereas the lease itself plainly specifies that the date is May 26, 1957. * * * The third is the false presumption that an oil and gas lease is divisible after the establishment of a pooling unit, with production on the unit after the unitization takes place, and with production taking place within the primary term. * * * The fourth erroneous presumption is that lessee is able to destroy the effect of the Conservation order by the establishment of a voluntary unit which would divide the obligations of the lease * * * but, in considering what has taken place on a unit where the original lease includes any property in that unit, we are impressed with the present holdings of our Supreme Court, that such a lease is indivisible in the obligations.”
The trial court concluded:
“In this case we are not convinced that the defendant had reasons for establishing a voluntary unit other than for the purpose of securing production according to the terms of the lease, or production within the primary term, on all the lands included in the lease, also, that he did secure such production.”
In rejecting defendant’s contentions that (1) the Tigner Unit Well located in the South Half (Si/4) of Section 33 had the effect of maintaining the entire lease in force beyond its primary term since the order of the Conservation Commissioner creating the Tigner Unit did not have the effect of dividing the lease, and (2) even if it should be considered that the lease was divided by the Commissioner creating the Tigner Unit, nevertheless, that portion of the lease which lies in Section 32 was. maintained in force by virtue of the drilling and completion of the Tigner A-l Unit Well and the tendering by the lessee to the lessor of the shut-in royalty payments in accordance with Paragraph 7 of the lease, the Court of Appeal considered the two following paragraphs of the lease:
“7. (a) It is agreed that if a well (or wells) is completed hereunder which is capable of producing gas only, (including gasoline and condensate con *59 tent) then' until such timé as such gas (including'gasoline and condensate content) is sold or utilized off the premises, or in the event Lessee should at anytime or times after gas (including gasoline and condensate content) is produced and sold off the premises from such well or wells, deem it inadvisable to produce and sell gas from such well or wells, and Lessee shall discontinue the production thereof, which right is hereby granted, Lessee shall during such periods pay Lessors at the rate of $200.00 per year, payable quarterly, for each such well on the premises from which gas (including gasoline and condensate content) is not being produced; and so long as such lieu royalty is paid said well or wells shall be considered wells producing gas in paying quantities under Paragraph 2 hereof.
******
“(c) The rights granted Lessee herein to discontinue the production of gas, including its gasoline and condensate content, may only be exercised so long as there is a well or wells on the leased premises capable of producing gas, including its gasoline and condensate content, in paying quantities.
* * # * * *
“14.- Lessee is hereby granted the power and right, at its option and without Lessors’ joinder or further consent, at'any time while this lease is in force, either before or after production, to combine and pool the lease, mineral and royalty rights in all the lands covered by this lease or any portion thereof with any other land, lands, lease, leases, mineral and royalty rights or any of them, adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation so as to create by such combination and pooling one or more drilling or production units. It is further agreed that Lessee may limit such pooling and unitization to any one or more producing horizons, and as to any one or more products, and, if limited, may extend the same from time to time as Lessee may deem, advisable so as to make any such pooling and unitization apply and extend to any other formation or formations, product or products, in addition to the formation or formations, product or products, originally designated, and Lessee may also declare any unit or units so as to conform to any valid rule or regulations of the Department of Conservation of the State of Louisiana touching upon or regulating that subject. Each such drilling or production unit shall not exceed 640 acres plus a tolerance not to exceed 10%' of 640 acres when created for the purpose of drilling for or producing gas, distillate • or condensate, or any combination of • *61 such products therefrom, and 40 acres, plus a tolerance not to exceed 10%' of 40 acres when created for the purpose of drilling for or producing oil therefrom unless the same shall be larger or smaller than the maximum drilling or production unit fixed as a basis for the development or operation of the field by the Conservation Department of the State of Louisiana, or other regulatory body, Federal or State, having jurisdiction in the premises, in which event each such unit created hereunder shall not exceed the maximum so prescribed for and in force in the field at the time such unit is created. Lessee shall execute in writing and record in the Conveyance Records of the parish or parishes in which each unit created hereunder is located an instrument identifying and describing each such unit. As between the parties hereto the entire acr-eage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units, as if it were included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only . such proportion of the royalties stipulated herein as the amount of Lessors’ ■ acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved. Drilling or reworking operations on or the production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all the lands covered hereby, subject to the exceptions hereinafter mentioned. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors’ and Lessee’s rights in force hereunder as if such operations were on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby which is included in such pooled unit. This lease, during any period in which it is being so maintained as to any part of the land covered hereby included within any such unit, may be maintained as to the remainder, in any manner elsewhere provided for herein, provided that if it be maintained by rental payment, the rentals shall be reduced to the extent of the number of acres covered by this lease and which are included in such unit or units. The Lessee may place and use on each unit created hereunder common measuring and receiving tanks for the production from such unit.
*63 “It is agreed that as to the separately owned tracts covered by this lease the mineral rights and royalties of the Lessors hereunder are not pooled or -unitized merely by virtue of the joint execution of this lease and that such mineral rights and royalties shall be deemed to be pooled or unitized only in the event and to the extent that the same are so pooled or unitized by Lessee’s action as above set forth.”
After reviewing the case, the Court of Appeal concluded that Paragraph 14 of the lease applied solely and only to units voluntarily created by the lessee in the form and in the manner designated therein. It correctly observed that “No provision is contained therein relating specifically to forced units created by orders of the Commissioner •of Conservation. Nor does the lease contemplate that its provisions would be applicable to such forced pooling.” [129 So. 2d 534] It further concluded that Paragraph 14 was not misleading and that when consideration was given to all of its provisions, it became evident that the entire paragraph (14) related solely to voluntary units and not forced-pooled units by actions of the Commissioner of Conservation; that the effects of voluntary unitization did not extend to a unit pooled by orders of the •Commissioner; that the provisions of the lease relating to voluntary pooling by the lessee contemplated that operations on, or production from, the voluntary unit should only extend to the leased lands included in that unit and should have no effect as to other of the leased premises not included therein.
The Court of Appeal further concluded and held:
“ * * * the effect of the forced unitization of a portion of the leased lands, so far as maintaining the lease in force and effect as to the leased lands not included within the forced unit, extended only to May 20, 1957, when the voluntary unit was created and became effective, as, on that date, by the action of the lessee undertaken in accordance with the provisions of paragraph 14, the leased property was divided and segregated and the lease and its obligations divided. Thus, as to plaintiffs’ lands covered by defendant’s lease, located in Section 32, the preservation of the lease beyond its primary term, expiring with May 26, 1957, depended upon whatever operations were conducted on or production secured from said leased lands or on lands in a unit of which plaintiffs’ lands comprised a part before the expiration of the primary term of the lease.”
The Court of Appeal found that neither were operations conducted on nor production secured from either the land or lands in Section 32 after the formation of the voluntary unit and prior to the expiration of defendant’s lease; it relied on the case *65 of Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416. It still further found that no payment of lieu royalty was made or tendered before the expiration of the primary term of the lease. It denied plaintiffs attorney’s fees because they prayed for the cancellation of the entire lease and were only successful in having it cancelled in part; it allocated the costs one-half to the plaintiffs and one-half to the defendant.
Union Producing Company, relator, assigns the following Specification of Errors in the judgment of the Court of Appeal ordering the cancellation of the instant lease as to lands located in Section 32:
“1. The Court of Appeal erred in holding that the decision in Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416 (1954) controls this case on the ground that the terms of the lease in the Wilcox case ‘are substantially the same’ as the terms of the Odom lease.
“2. The Court of Appeal erred in holding that the shut-in Tigner A-l Well in Section 32 was not equivalent to production from the voluntary unit because it was completed to production prior to the formation of the unit, despite the provision of Paragraph 14 of the lease that lessee could pool ‘either before or after production.’
“3. The Court of Appeal erred in holding that shut-in royalty had to be paid in advance, when the lease specifically provides that such payments ‘shall’ be made ‘quarterly,’ but does not require payment in advance.
“4. The Court of Appeal erred in holding that by creating the voluntary unit ‘such action resulted in a division of the lease,’ and also erred in stating that defendant ‘concedes’ that the voluntary unitization had this effect.
“5. After holding that there was no production from the voluntary unit, the Court of Appeal erred in not holding that the prior production from the Conservation unit in Section 33 continued the lease in force and effect in its entirety.”
Relator also contends:
“The Odom Lease was continued in full force and effect as to all of the land described therein by production from the Conservation Unit in Section 33—it was Unnecessary for Relator to form the voluntary unit in order to hold the acreage in Section 32.”
At the outset, we find that Paragraph 14, supra, provides for a voluntary unit and not a force pooled unit by the Conservation Commissioner. We agree with the able reasons for such interpretation which the Court of Appeal set forth in its decision; therefore, no further discussion is necessary.
Under the present lease, the forced unitization of Section 33 by the Conservation Commissioner had the effect of maintaining *67 the instant lease in force and effect as to the leased lands not .included within the forced unit for a limited time.
Paragraph 14, supra, of the lease granted the parties to the lease the right to pool the lease with adjoining lands. This paragraph also provides that if operations be conducted on or production be secured from land in any pooled unit other than land covered by the lease, it shall have the same effect as to maintaining Lessors’ and Lessee’s rights ■ in force as if such operations were on or süch production from the land covered thereby. An exception follows; it states that “this effect shall be limited to the land covered hereby which is included in such pooled unit.”
Our recent jurisprudence, although recognizing the doctrine of LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855, that the lessee’s obligation to drill a well is indivisible in its nature and the lessor’s corresponding obligation to deliver the land is also indivisible, with the result that if the obligation of one is fulfilled in its entirety, then the obligation of the other is also fulfilled in its entirety, has held that the parties to a mineral contract may by their conventions reduce the acreage covered by such contract. See, Elson v. Mathewes, 224 La. 417, 69 So.2d 734; Childs v. Washington, 229 La. 869, 87 So.2d 111; Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721; Brown v. Mayfield, La.App., 92 So.2d 762; and, Richard v. Sohio Petroleum Company, 234 La. 804, 101 So.2d 676.
By their conventions the parties to the instant lease agreed that when a voluntary unit was formed it would only cover plaintiffs’ lands located within the unit. Therefore, on May 20, 1957, when the voluntary unit was filed for registry, the action of the lessee had the effect of reducing or removing from the control of the Conservation Unit plaintiffs’ lands located within Section 32.
We do not find that the Specification of Errors, supra, necessitates a detailed discussion of the numerous authorities treating of oil, gas, and mineral leases. The Specification requires an interpretation of the instant lease—particularly Paragraphs 7 and 14, supra—and its application to the facts of record.
The instant lease is the contract between the parties; the mineral lease is merely a contract which permits the lessee to explore for minerals on the land of the lessor in consideration of the payment of a rental and/or bonuses. Perkins v. Long-Bell Petroleum Co., Inc., 227 La. 1044, 81 So.2d 389; Reagan v. Murphy, 235 La. 529, 105 So.2d 210. All of the clauses of the agreement of lease are to be interpreted “the one by the other,” giving to each the sense that results from the entire act. See, LSA-C.C. Art. 1955. Contracts must be construed as a whole; the court will, if *69 possible, give effect to all parts of the instrument, and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. United Carbon Co. v. Interstate Natural Gas Co., Inc., 176 La. 929, 147 So. 37. In interpreting an agreement the intention of the parties and the effect given to it must be ascertained. Simmons v. Hanson, 228 La. 440, 82 So.2d 757. In a doubtful case the agreement is interpreted against him who has contracted the obligation. LSA-C.C. Art. 1957; Robbert v. Equitable Life Assur. Soc. of United States, 217 La. 325, 46 So.2d 286. Any doubt as to the meaning of a document must be resolved against the company in whose office it was prepared. Texas Co. v. Crais, La.App., 155 So. 405; Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075; Lawson v. Martin Timber Company, 238 La. 467, 115 So.2d 821. An order of the Department of Conservation may supersede the contracts made between landowners and lessees. Alston v. Southern Production Co., 207 La. 370, 21 So.2d 383.
Paragraph 7, supra, provides for a shut-in well and states that as long as lieu royalties are paid quarterly, the well shall be. considered as producing gas in paying quantities. Section (c), supra, indicates that it was the intention of the drafter that the section should apply to a well on the-leased premises. No mention is made in' the paragraph as to pooling or-unitization;! no statement is made as-to the effect, of such> a well when it is located off of the leased-premises.
In Delatte v. Woods, 232 La. 341, 94 So. 2d 281, 287 we held that, “The completion and the existence of a shut-in gas well on a validly created unit are equivalent to production on all tracts in order to interrupt’ the prescription accruing against royalty interest and preserve same from extinction by prescription,” but, in that case we were considering a well on a unit force pooled' by the Department of Conservation.
Paragraph 14, supra, states that the lessee may, without the lessor’s joinder or further consent, at any time while the lease is in force, either before or after production, combine and pool the lease with the land covered by the lease or any other land, but no mention is made—which we have held applies only to a voluntary unit—of a “shut-in” well or the location of such a well off of the leased premises.
In interpreting a contract the relation of the parties may be considered, their connection with the subject matter of the contract and the circumstances under which it was made in determining the intention’ from the entire agreement. Simmons v. Hanson, 228 La. 440, 82 So.2d 757. Here,' plaintiffs and defendant.are diverse'in their interpretation of 'the lease.. If'.the léase) were to be interpreted as proposed-by the; *71 lessee, it would have the privilege of completing a shut-in well on property other than the lessor’s not paying lieu royalties for approximately three months, and unitizing the lessee’s property jointly with the property containing the shut-in well indefinitely. Plaintiffs contend that the Tigner A-.l Well which was drilled to completion and shut-in before the formation of the voluntary unit under lease provisions was not a well completed under the Odom Lease.
■ We find that the instant lease must be interpreted against lessee, who drafted it, and that in order to read Paragraphs 7 and 14 together we must conclude that, in order to continue the instant lease under the circumstances of the case beyond its primary term by the completion of a shut-in well on the voluntary unit, operations had to be conducted on the land of the lessors, namely, the ninety-eight (98) acres in Section 32, which were included in the Voluntary Tigner “A” Unit.
Because of our conclusion, supra, we do not find it necessary to pass on whether or not the case of Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, is apposite. Respondent has made no complaint as to the assessment of costs by the Court of Appeal; we find that its assessment is correct.
For the reasons assigned, the judgment of the Court of Appeal, Second Circuit, is affirmed. .....
HAMITER, J., concurs in the result.
HAWTHORNE and SANDERS, JJ.; concur in the decree.
McCALEB, J., dissents with written reasons.
SUMMERS, J., dissents and assigns reasons.

. “SE% of SE% and SW% of SE% except 10 acres off the west end of said last named quarter, S% of NE14 of SE14 and a tract of land containing eight (8) acres described as commencing at the northwest corner of the SE% of SE14 of Section 32, thence run west 170 yards, thence north 220 yards, thence east 170 yards, thence south 220 yards to the starting point, all in Section 32, and the SW% of SW14 of Section 33, all in Township 23 North, Range 6 West, Claiborne Parish Louisiana.”

. Stipulation of Facts, Paragraphs 8 and 9. • . .

. Stipulation of Facts, Paragraphs 10 and 11.

. Cheek -was not cashed.