Joanna Wurtelle **LOWMAN**, et al

v.

**CHEVRON U.S.A. INC.**

**Civ. A. No. 81–461–A.**

United States District Court, M.D. Louisiana.

Nov. 7, 1983.

Thomas J. Wyatt, Shreveport, La., for plaintiffs.

John C. Christian, New Orleans, La., for defendant.

JOHN V. PARKER, Chief Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a diversity action which began in state court and involves the resolution of questions of Louisiana mineral law which are peculiarly suitable for resolution by Louisiana's own courts. The defendant, Chevron, however, removed the action to federal court as authorized by the Congress. 28 U.S.C. § 1441(a). Because this court is not authorized to seek clarification from Louisiana's courts, it must accept jurisdiction and proceed to decide the issues, applying Louisiana law as best it can.

Plaintiffs are the owners of an undivided interest in and are lessors of a tract of land containing some 4,314 acres in Pointe Coupee Parish, Louisiana. The defendant, Chevron, holds a mineral lease upon that tract of land. Portions of the tract are included in six different drilling or production units established by Louisiana's Commissioner of Conservation. One of the unit wells, the Parlange No. 2, in the Judge Digby Field was completed as a gas producer and has been in continuous production since July 4, 1978. The purpose of this action by the lessees is to obtain partial cancellation of those portions of the Lowman lease which are included in three units, established by the Commissioner of Conservation, and referred to here as the Albritton, Deville No. 1 and Harlaux units. The predicate for the claimed cancellation of the lease is late payment of "shut-in" rental due under the terms of the lease.

The facts are in large part undisputed, and the court hereby adopts as findings of fact all those facts set forth in Paragraph 8 of the pretrial order listed under "Facts Established by Pleadings or by Stipulation or Admission of Counsel." These facts are extensive and detailed. They will not be repeated in their entirety. Essentially, the established facts show that a portion of the Lowman lease was included in each of six different units established by the Louisiana Commissioner of Conservation. The Parlange No. 2 well was completed in July, 1978, and has been continuously producing since then. The lease contains a "Pugh clause," which will be quoted infra, providing that production from a unit well will maintain the lease in effect only as to that portion actually included within the unit. Delay rentals are required to be paid to maintain that part of the lease which is not included in a unit. This lease was entered into on July 7, 1972, and has a primary

term of ten years. It is on the familiar "unless" form providing that the lease terminates one year from the date of its execution and each year thereafter unless the lessee is drilling or there is production or delay rentals have been paid. On July 7, 1979, the anniversary date of the lease, the Parlange No. 2 unit well was producing and the LeBlanc-LeJeune and Wagley-Lowman-Merrick unit wells (each of which included a portion of the Lowman lease) were drilling. Chevron concluded that it would pay "Pugh clause" rentals on all of that portion of the lease not included in one of the units and it did so. On July 7, 1980, the next anniversary date of the lease, the Parlange unit well was still producing, the LeBlanc-LeJeune well had commenced producing, the Lowman-Merrick well (which had replaced the Wagley well as the unit well) was drilling and the Albritton, Deville No. 1 and Harlaux No. 1 unit wells situated on units created by the Commissioner of Conservation were all drilling. Again, Chevron paid "Pugh clause" rentals on all of the acreage of the Lowman lease which was not included in one of those six units.

The Albritton, Deville No. 1 and Harlaux wells were each completed as gas wells capable of production in paying quantities. As each well was completed, it was shut-in. Chevron concluded that it would pay the lessor "shut-in" rental under paragraph 6 of the lease, which will be quoted infra, requiring that such payments be made within ninety days "from the discontinuance of operations."

Paragraph One of the lease provides that the mailing of lessee's check to the lessor's bank shall constitute payment. Chevron computed the acreage of the Lowman lease included within the three shut-in units, Albritton, Deville No. 1 and Harlaux, and on January 19, 1981, mailed a check to the lessor's bank as payment of "shut-in" rental under the provisions of the lease. Although prepared on January 16, 1981, the check bore the date "07 16 81" which both parties agree means July 16, 1981—a date which is more than ninety days after discontinuance of operations on each of the three wells at issue. On March 25, 1981, a date more than ninety days following discontinuance of operations on the last well completed, plaintiffs' attorney notified a representative of Chevron that the "shut-in" rental check was dated July 16, 1981, and that the lease had terminated as to those portions of the property included in the Albritton, Deville No. 1 and Harlaux units. Chevron prepared a "replacement check" dated April 2, 1981, which it mailed on April 3, 1981. The plaintiffs rejected the amount tendered and returned both checks to Chevron.

Plaintiff takes the position that the lease, as to the acreage in each of the three units at issue, expired on the ninetieth day following "completion" because a post-dated check is not timely payment. Chevron takes the position that, despite the fact that it paid "Pugh clause" rentals, the units established by order of the Commissioner of Conservation did not trigger the necessity for such payments under the terms of the lease, and that the entirety of the lease was maintained in effect by production from the Parlange and, subsequently, the LeBlanc-LeJeune well and consequently that it had no obligation to pay either "Pugh clause" rentals or "shut-in" rentals. Plaintiff argues that Chevron, by making such payments on July 7, 1979, and July 8, 1980, showed that its construction of the lease was that "Pugh clause" rentals were, indeed, due; and since lessors accepted those payments, the construction of an ambiguous portion of the contract by the parties themselves should be accepted by the court. Alternatively, plaintiff argues that even if the clause is not ambiguous, Chevron's offering such payments and lessors' accepting such payments amounts to a reformation of the contract to that extent.

The court makes the following additional findings of fact.

Chevron was in good faith attempting to pay "shut-in" rentals timely when it issued its check number LR24187; the date upon it, "07 16 81," was a typographical error made by an experienced secretary who intended to date the check January 16, 1981.

Chevron's representatives had concluded that under the lease provisions production from the Parlange unit well was sufficient under Louisiana law to hold the entire lease without payment of "Pugh clause" or "shut-in" rentals but decided to pay them out of an abundance of caution.

Chevron never indicated to lessors that it was making payments which it believed were not actually owed.

Paragraph two of the lease, the "pooling clause" reads in pertinent part, as follows:

Lessee, at its option, is hereby given the right and power without any further approval from Lessor at any time and from time to time, to pool or combine the land or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases and mineral interests in the immediate vicinity thereof, when, in Lessees' judgment, it is necessary or advisable to do so in order to properly explore or develop or operate said premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises or to prevent waste or to avoid the drilling of unnecessary wells or to comply with the spacing or unitization order of any Regulatory Body of the State of Louisiana or the United States having jurisdiction.

\* \* \* \* \* \*

Lessee shall execute and file for record in the Conveyance Records of the Parish in which the land herein leased is situated a declaration describing the pooled acreage; and upon such filing, the unit or units shall thereby become effective, except that when a unit is created by order of a Regulatory Body, the pooling shall be effective as of the effective date of such order, and no declaration shall be required in connection therewith.

All units created upon the Lowman lease were created by the Louisiana Commissioner of Conservation under the authority, inter alia, of La.R.S. 30:4. Chevron has never created any unit on the Lowman lease and has never filed any document in the conveyance records of Pointe Coupee Parish indicating such a voluntary unit.

Paragraph 14 of the lease is a typewritten addendum containing the "Pugh clause" and it reads in pertinent part as follows:

Anything to the contrary elsewhere in this lease notwithstanding, it is understood and agreed that drilling, mining or re-working operations upon, or production of any mineral from any unit established by a Lessee pursuant to Paragraph 2 hereof shall not serve to maintain this lease as to the non-unitized portion, i.e. that portion of the leased lands not included in any such unit, but only as to the unitized portion, i.e. that portion of the leased lands included in such unit. If any such unit is established, then this lease may be maintained (a) as to the non-unitized portion and (b) separately as to each unitized portion in any manner elsewhere provided in this lease. If Lessee shall elect to maintain this lease by payment of rental, such payment shall be calculated at the rate per-acre provided in or determinable from Paragraph 1 or Paragraph 1(a) hereof and shall be paid (a) on the number of acres of the leased lands in the non-unitized portion and held by a Lessee hereunder, or (b) on the number of acres of the leases (sic) lands in any unitized portion as to which payment is made or (c) both, if Lessee shall so elect; but such rental payment shall maintain this lease in effect only as to that portion of the leased premises not maintained in some other manner provided for in this lease...

Paragraph 4 of the lease, relating to abandonment of wells drilled provides in pertinent part:

Prior to the time that oil, gas or some other mineral is being produced from the leased land or land pooled therewith (or with any part thereof), Lessee may maintain the rights granted during and after the primary term by carrying on operations on said lands or land pooled therewith (or with any part thereof) without the lapse of more than ninety (90) days

between abandonment of work on one well and the commencement of operations for drilling or re-working another; and during the primary term such operations may be discontinued and the rights granted maintained by commencing or resuming rental payments, by paying within ninety days (90) from the discontinuance of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between the end of said ninety (90) days and the next ensuing rental paying date or the expiration of the primary term bears to the twelve months' period ...

Paragraph 6 of the lease, relied upon by both sides as a "shut-in" rental clause provides in pertinent part:

After the production of oil, gas or any other mineral in paying quantities, either on the leased premises or, on lands pooled therewith (or with any part thereof), the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities. It is provided, however, that if, after the production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause, and Lessee is not then engaged in drilling or re-working operations, this lease shall terminate unless the Lessee resumes or restores such production, or commences additional drilling, re-working or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of re-working operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals.

. . . . . .

In the event that any well on the land or on property pooled therewith (or with any part thereof), is capable of producing gas or gaseous substances in paying quantities but such minerals are not being produced, then Lessee's rights may be maintained, in the absence of production or drilling operations, by commencing or resuming rental payments as hereinabove provided for in connection with the abandonment of wells drilled ...

The Christmas tree was installed on the Albritton well on September 26, 1980, on the Deville No. 1 well on December 7, 1980, and on the Harlaux well on December 4, 1980. Additional operations were required on each of these wells in order to bring them in as wells capable of producing gas in paying quantities; those operations continued until October 21, 1980, on the Albritton well until December 11, 1980, on the Deville No. 1 well, and until December 15, 1980, on the Harlaux well; and those dates constitute respectively, the date on which operations were discontinued on each of those wells.

▬ The first issue presented for resolution is whether under the facts of this case, Chevron was required to commence "Pugh clause" rental payments following the Commissioner's order which created the Parlange No. 2 unit well and following production from that well. The facts show that Chevron did, in fact, make those payments on July 7, 1979, and July 7, 1980. It is clear that in the absence of a "Pugh clause," unit orders of the Commissioner of Conservation do not divide the mineral lease and that operations either on the leased acreage or on lands unitized with it served to maintain the lease in its entirety. *Hunter Co. v. Shell Oil Co.*, 211 La. 893, 31 So.2d 10 (1947); *LeBlanc v. Danciger Oil & Refining Co.*, 218 La. 463, 49 So.2d 855 (1950). This jurisprudence has now been incorporated into Louisiana's Mineral Code: "... [O]perations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened." La. R.S. 31:114. It is clear that under Louisiana law, in the absence of a "Pugh clause," production from the Parlange well would continue the Lowman lease in effect as to

its entirety without payment to the lessors of any amount except that due as royalty from the Lowman lease's share of the production from the Parlange well. As article 3 of the Mineral Code recognizes, parties are free to provide for a result different from that contemplated by article 114, which is the purpose of a "Pugh clause." Paragraph 14 of the lease, the "Pugh clause" in this lease, is not vague or ambiguous. It applies only to "any unit established by Lessee pursuant to Paragraph 2 hereof." Paragraph 2, the pooling clause, is also not vague or ambiguous. It clearly and specifically grants the right to the Lessee, at its option, to create voluntary units and provides a specific procedure for so doing, including the filing of a declaration in the conveyance records of the Parish of Pointe Coupee. Chevron did not utilize the provisions of Paragraph 2 of the lease and did not create any voluntary units involving the Lowman lease. Accordingly, the "Pugh clause" was not triggered by the creation of units under the orders of the Commissioner of Conservation.

Although we have found only one Louisiana case involving a situation similar to that before the court, the sparse jurisprudence supports that conclusion. In *Odom v. Union Producing Company*, 129 So.2d 530 (La.App. 2d Cir.1961), reversed on other grounds, 243 La. 48, 141 So.2d 649 (1962), the Court of Appeal construed a similar "Pugh clause" as applying only to a voluntary unit created by the Lessee, not a force pooled unit created by the Commissioner of Conservation. The Supreme Court of Louisiana in its original opinion specifically affirmed that finding of the Court of Appeal but on rehearing, the Supreme Court decided the case on other grounds and did not decide the voluntary unit issue presented. Two federal cases applying Louisiana law, however, have considered this question. Although the language in the leases involved in the two federal cases was not identical to that before this court, the intent was the same, in that voluntary unit authority was granted to the Lessee and the "Pugh clause" made reference only to units formed by the Lessee under that authority. In *Smith v. Carter Oil Co.*, 104 F.Supp. 463 (W.D.La.1952), Judge Porterie commented, "The question is not whether the Lessee *could* have 'divided' the lease, but whether the Lessee *did* the act which the lease specifies should result in division." 104 F.Supp. at 467. The court found that the Lessee had not created any unit nor recorded any declaration in the conveyance records to that effect; on the contrary, the only units formed were under the orders of the Commissioner of Conservation. In concluding that the "Pugh clause" payments were not triggered by formation of units under orders of the Commissioner, the court commented:

Although the lease may grant the Lessee the right to divide the lease into two or more leases, affecting segregated portions of the original leased premises, upon the doing of an act solely within the power and option of the lessee pursuant to provisions of the lease, such provision does not render the lease divisible unless and until the contemplated act is done by the lessee... The lessee here did not execute and record a pooling designation and notify the lessor by a certified copy thereof through registered mail, as required by Paragraph 6 if the lessee is to exercise the option thereunder. (104 F.Supp. at 471).

In the case of *Bennett v. Sinclair Oil & Gas Co.*, 275 F.Supp. 886 (W.D.La.1967), affirmed 405 F.2d 1005 (1968), the court considered "Pugh clause" language identical to that involved in the *Carter Oil* case, *supra*, and concluded that production from a unit well established by order of the Commissioner of Conservation which included a portion of the leased premises maintained the lease in its entirety without the obligation to pay "Pugh clause" rentals. The agreement authorized the Lessee to establish voluntary units, but no such voluntary units had been established.

While, as noted, no Louisiana cases are directly in point, the lease agreement involved here is not ambiguous, and it is

clear that the Lessee has not, in fact, taken the steps necessary to "divide" the lease and thus become obligated to pay "Pugh clause" rentals. In Louisiana the contract is the law between the parties. La.Civ. Code art. 1901; *Odom v. Union Producing Co.*, 243 La. 48, 141 So.2d 649 (1962). This contract clearly provides that the Lessee is granted the option to divide the lease by formation of voluntary units and that if such voluntary units are formed, drilling or production within the voluntary unit will maintain only that portion of the lease which is included within the unit; In order to maintain the acreage outside the unit, the Lessee is obligated to pay "Pugh clause" rentals. Here the lessee did not exercise the option granted to it, and the only units are those established by order of the Commissioner. Under these circumstances, production from the Parlange well had the effect of maintaining the entire Lowman lease; thus Chevron incurred no obligation to pay "Pugh clause" rentals. *Hunter Co. v. Shell Oil Co., supra;* La. R.S. 31:114.

■ Plaintiffs do not seriously dispute this interpretation of the contract or that "Pugh clause" rentals were not actually owed by Chevron. Plaintiffs' primary argument is that Chevron's voluntary payments which it identified as "Pugh clause" rentals due on January 7, 1979, and January 7, 1980, together with acceptance of those payments by lessors, constitute a modification of the contract requiring Chevron to pay such rentals upon the formation of units by the Commissioner of Conservation, as well as upon the formation of voluntary units. Plaintiffs rely principally upon the case of *Davis v. Laster*, 242 La. 735, 138 So.2d 558 (1962). The decision in that case was predicated upon article 1956 of the Louisiana Civil Code which reads: "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation." The lease involved in the *Davis* case was dated January 16, 1947, and had a primary term of ten years. In September,

1948, the lessee drilled and completed a gas well which was capable of production in paying quantities. It was, however, isolated from other production and there were no pipeline facilities available; consequently, the well was shut-in. The lessee drilled nine more wells in the general area, all dry holes. In 1952, the lessee released all but 180 acres of the lease. During the period from 1948 to 1958 while the well was shut-in, the lessee paid delay rentals for each of the nine years. The lease contained a provision authorizing payment of "shut-in" royalty in the amount of $50.00 per well when a well was shut-in. Prior to the end of the primary term, the lessee tendered the sum of $18.75, representing plaintiff's portion of the total shut-in royalty of $50.00, which plaintiff refused. Plaintiff then filed suit to cancel the lease. The delay rentals paid following the shut-in of the well, which lessor had accepted over a period of nine years, were significantly higher than the shut-in royalty would have been. The court held that the provisions of the lease regarding payment of shut-in royalty were ambiguous and concluded that the fact that the lessee elected to pay the higher delay rentals rather than shut-in royalties during the primary term of the lease (but after the well was shut-in) did not preclude the lessee from maintaining the lease beyond the primary term by paying the shut-in royalty before the end of the term. The court relied upon article 1956 and commented that the lessor had no cause to complain when he accepted the higher delay rentals for nine years rather than the shut-in royalty. Accordingly, the court refused to cancel the lease.

The primary reason that *Davis v. Laster* has no application here is that the language of the contract before this court is not ambiguous. The provisions of Paragraphs 2 and 14, when read together, are crystal clear. The court has found that Chevron determined that under the terms of the lease no "Pugh clause" rentals were due and that no "shut-in" royalty was due following shutting-in of the three wells, the Albritton, Deville No. 1 and Harlaux.

Chevron's express purpose in making the payments was to protect itself from possible claims that it had not lived up to the terms of the lease, and since the amounts involved were relatively small, chose to make those payments rather than risk possible litigation. We conclude as did the court in *Smith v. Carter Oil Co.* that the lessors ought not to complain that they were paid a sum not due in 1979 and 1980 —"The plaintiff has not shown that he suffered any injury by reason of the defendant's error or gift in making the tenders." (104 F.Supp. at 472).

There has been no modification of this lease.

 Plaintiffs imply that because Chevron petitioned the Commissioner of Conservation to hold hearings and to establish the units at issue here that the Commissioner's orders somehow become actions of Chevron amounting to establishment of voluntary units. This same proposition was specifically rejected in *Smith v. Carter Oil Co.,* *supra,* and this court finds no more merit to that notion. While Chevron certainly may request the Commissioner to hold hearings and to establish units, there is no question but that only the Commissioner, not Chevron, has the authority to establish forced pooling units under La.R.S. 30:1 et seq.

In summary we conclude that the contractual provisions in this lease relative to unitization apply only to voluntary units created by the lessee and that no voluntary units have been created. Since the only units involved are created by order of the Commissioner of Conservation and there is no "Pugh clause" restriction relative to units created by the Commissioner of Conservation, production from the Parlange unit well in 1978 continued to maintain the entire Lowman lease in effect without payment to the lessors of any sum except that due from the production of that well. Accordingly, there was no obligation to pay "shut-in" rentals on the Albritton, Deville No. 1 and Harlaux unit wells because the entire Lowman lease was maintained by production from the Parlange unit well.

*Hunter Co. v. Shell Oil Co., supra; LeBlanc v. Danziger Oil & Refining Co., supra; Fremaux v. Buie,* 212 So.2d 148 (La.App. 3d Cir.1968).

Because of the result which we reach in this case, it is unnecessary to pass upon Chevron's claims that its postdated check was tendered as an "honest mistake" and that consequently Chevron should be relieved from the harsh consequences of cancellation for failure to timely pay under cases such as *Jones v. Southern Natural Gas Co.,* 213 La. 1051, 36 So.2d 34 (1948); that plaintiffs are estopped from demanding cancellation because of their failure to promptly notify Chevron concerning the post-dated check, thereby giving Chevron an opportunity to rectify the matter; and that the action of the payee bank designated by the lessors in endorsing the check and sending it on to the lessors binds plaintiffs. We express no opinion upon the merits of these claims.

For the foregoing reasons, there will be judgment in favor of defendant Chevron and against the plaintiffs, Joann Wortelle Lowman, et al, dismissing their action.