471 So.2d 938 (1985)
Lavada Gilbert MATHEWS, Albert L. Mathews, Jr. and Emmett A. Mathews, Plaintiff-Appellant,
v.
GOODRICH OIL COMPANY, Grigsby Petroleum, Inc. and Arkansas Louisiana Gas Company, Defendant-Appellee.
No. 17060-CA.
Court of Appeal of Louisiana, Second Circuit.
June 12, 1985.
*939 Culpepper, Teat, Caldwell & Avery, by James D. Caldwell, Jonesboro, for plaintiff-appellant.
Hargrove, Guyton, Ramey & Barlow, by David L. Smelley, Shreveport, for defendant-appellee.
Before JASPER E. JONES, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
Plaintiffs, Lavada Gilbert Mathews, Alfred L. Mathews, Jr. and Emmett A. Mathews appeal from the judgment of the trial court granting a motion for summary judgment in favor of defendants, Goodrich Oil Company, Grigsby Petroleum, Inc. and Arkansas Louisiana Gas Company, in their action to cancel an oil, gas and mineral lease, for damages and for injunctive relief. We affirm the judgment of the trial court for the following reasons.
On June 16, 1962, plaintiffs' predecessor in title, Mrs. Zillah Gilbert, executed an oil, gas and mineral lease in favor of W.C. Feazel. It appears that the defendant, Goodrich Oil Company, was later assigned an interest in the lease by the widow and heirs of Feazel. The lease covered approximately fifty-one acres of property located in Jackson Parish, Louisiana, more particularly described as follows:
N1/2 of NE1/4, of SE1/4, and SE1/4 of NE1/4, less 9 acres in Northwest corner, Section 19, Township 15 N.R. 3 West.
The lease is contained on a standard printed form (Bath's 14BRI-2A) and provides for a primary term of five years and as long thereafter as oil, gas or other minerals were being produced from the land or land pooled therewith. The lease does not contain a Pugh Clause.
On August 15, 1962, the Louisiana Department of Conservation issued Order No. 603, effective September 1, 1962, which established *940 rules and regulations and the creation of drilling and producing units for the Hosston "A" Zone in Hodge Field, Jackson Parish, Louisiana. One of the units created by the order, the Hosston "A" SU B, included approximately twenty acres of the leased acreage.
On June 3, 1963, the F.P. McBride No. 1 Well, located in this unit, was spudded. The well was completed on or about July 18, 1963 and has been in continuous production since April of 1964.[1]
In the ensuing years, additional producing wells have been drilled in units established by orders of the Louisiana Department of Conservation.[2] These units contained portions of the leased property, although none of the wells drilled in those units were physically located on plaintiff's property.
On March 3, 1982, the Louisiana Office of Conservation issued Order No. 603-H-3 establishing the James Lime RA SU G unit. This unit contains approximately 31 acres of the leased property which were not included in any of the previous units. On May 30, 1982, the Grigsby Petroleum, Inc., Mrs. A. Mathews No. 1 Well was spudded in this unit and completed in the James Lime, Reservoir A on July 2, 1982. This well, designated as the unit well, is physically located on the leased property and was in production at the time of the proceedings conducted in the trial court.
Plaintiffs, Lavada Gilbert Mathews, Alfred L. Mathews, Jr. and Emmett A. Mathews, instituted this action on March 28, 1984. Plaintiffs alleged that they were the owners of the property encumbered by the lease and that defendants, Goodrich Oil Company (hereinafter referred to as Goodrich) and Grigsby Petroleum, Inc. (hereinafter referred to as Grigsby) were the assignees of the original lessee, Feazel. Plaintiffs asserted that the lease had expired for nonuse and due to the failure of the lessee to furnish to the plaintiffs a certified copy of an instrument describing pool acreage. Plaintiffs prayed for a permanent injunction prohibiting further drilling operations and ordering the removal of all drilling equipment and for damages. Plaintiffs also prayed for injunctive relief ordering the removal of a pipeline constructed across the property by defendant, Arkansas Louisiana Gas Company, pursuant to a gas purchase contract with Goodrich.
On July 5, 1984, the defendants filed a motion for summary judgment which was granted by the trial court. There are no reasons for judgment contained in the record.
On appeal, the sole issue before this court is whether the trial court erred in finding that the plaintiffs were not entitled to a cancellation of the lease.
Plaintiffs argue that the lease, at least as it pertains to that portion of the property not included in the first unit, expired for nonuse both as to the primary term and the ten-year period set forth in LSA-R.S. 31:115. Plaintiffs also appear to argue that LSA-R.S. 31:114 is inapplicable since the plaintiffs' property which is subject to the lease is contiguous, rather than noncontiguous. Plaintiffs further contend that the lease lapsed by its very terms, particularly *941 Paragraph 6, regardless of whether the units were voluntarily formed or force pooled units formed under orders from the Office of Conservation. Plaintiffs also argue that maintaining the lease in effect abrogates the provisions of LSA-R.S. 31:122 and the principle of reasonable development. Finally, plaintiffs argue that cancellation of the lease is mandated due to the failure of the lessee to provide an instrument identifying and describing the pooled acreage included within the first unit.
It is first necessary to examine whether the lease remains in effect as to all of the leased acreage under the terms of the lease, particularly Paragraph 6.
Paragraph 6 of the lease provides as follows:
If at any time while this lease is in force and effect lessee in its opinion deems it advisable and expedient, in order to form a drilling unit or units to conform to regular or special spacing rules issued by the Commissioner of Conservation of the State of Louisiana, or by any other State or Federal authority having control of such matters, or in order to conform to conditions imposed upon the issuance of drilling permits, lessee shall have the right, at its option, to pool or combine the lands covered by this lease, or any portion or part thereof, with other land, lease or leases in the immediate vicinity thereof, whether such land, lease or leases are held by lessee or by others, such pooling to be into a unit or units not exceeding the number of acres, or the land subdivision, whichever may be the larger, allocated to one well by the above mentioned authority or authorities, and to be applicable only to such sands, horizons or strata as are covered by such regulations. Lessee shall execute in writing and record in the conveyance records of the parish in which the land herein leased is situated, an instrument identifying and describing the pooled acreage, and shall mail to the named lessor herein at his last known post office address, by registered mail, a certified copy of such instrument. As between the parties hereto and except as herein otherwise specifically provided, the entire acreage so pooled into a tract or unit be treated for all purposes as if it were included in this lease. In lieu of the royalties elsewhere herein specified, lessor shall receive, on the production from the unit so pooled, only such proportion of the royalties stipulated herein as the amount of his acreage (mineral rights) placed in the unit bears to the total acreage so pooled in the particular unit involved. Drilling operations on or production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all of the lands covered hereby, irrespective of whether any portion thereof has been pooled. If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or such production from land covered hereby, except that its effect shall be limited to the land covered hereby which is included in such pooled unit. This lease, during any period in which it is being so maintained as to part of the land covered hereby, may be maintained as to the remainder in any manner elsewhere provided for herein; provided, that if it be maintained by rental payment, the rentals may be reduced in proportion to the number of acres in such unit or units as to which this lease is being maintained by drilling operations or production. (Emphasis added)
Plaintiffs argue that the lease lapsed under the above provision as the lease provides that drilling operations or production shall maintain the lease only as to that portion of the acreage in the pooled unit, regardless of whether the unit was formed voluntarily or force pooled under orders of the Office of Conservation. Plaintiffs note that Order No. 603 was secured upon the *942 application of the original lessee, Feazel, and appear to argue that this constitutes voluntary pooling under the terms of Paragraph 6.
In examining an identical lease provision, the court in Smith v. Carter Oil Co., 104 F.Supp. 463 (W.Dist.La.1952), at 466 and numerous citations therein, found that:
... (i)ssuance of a pooling order by the Commissioner of Conservation of the state of Louisiana does not constitute a "division" of the indivisible obligation of the lease, and the lessor may not sue to cancel the portion of the leased premises lying outside the unit.
The court interpreted the provision as providing the only means by which a unit could be voluntarily formed. The court noted the provision specifically provides the manner in which the voluntary pooling can be effected, that is, the execution in writing and recordation in the conveyance records of the parish in which the land is situated, an instrument identifying and describing the pooled acreage. The court held that the issuance of pooling orders from the Commissioner of Conservation did not constitute an exercise of the option of the provision by the lessee. Further, the pooling was not considered by the court to be voluntary even though it appears that the pooling orders were secured upon the application of one of the sublessees. In short, even though the pooling orders were a result of the application of a sublessee, the court found it did not constitute a division of the lease because the pooling was not accomplished by the exclusive means set forth by the lease but rather by orders of the Commissioner of Conservation. The court concluded that the pooling provision of the lease could be brought into operation only in the manner specified. If this was not done, the lease remained a single indivisible obligation and the plaintiff was not entitled to a partial cancellation.
As noted earlier, Paragraph 6 in the lease in the instant case is identical to the lease provision construed by the court in Smith v. Carter Oil Co., supra. The arguments made by the plaintiffs were previously considered and rejected by the court in Smith v. Carter Oil Co., supra, for reasons which we find to be compelling. See also Lowman v. Chevron U.S.A., Inc., 599 F.Supp. 14 (M.Dist.La.1983), affirmed 748 F.2d 320 (5th Cir.1984).
As noted by the court in Smith v. Carter Oil Co., supra, the provision specifies the exclusive means by which a lessee may exercise the option to form a voluntary pool, that is, by the execution and recordation in the conveyance records of the parish in which the leased land is situated, an instrument identifying and describing the pooled acreage. The units in the instant case were created by orders of the Commissioner of Conservation, not by the means set forth in Paragraph 6 and thus could not be considered as voluntarily formed. As the pooling was compulsory, rather than voluntary, it did not act to divide the leasehold under the express terms of the provision. As no division of the leasehold occurred, the production from the various units, which included a portion of the leased acreage, acted to maintain the lease in effect over the entirety of the leasehold. See also Odom v. Union Producing Company, 129 So.2d 530 (La.App. 2d Cir.1961), reversed on other grounds, 243 La. 48, 141 So.2d 649 (1961).
The fact that the order of the Commissioner may have been secured upon the application of the original lessee, Feazel, does not alter the finding that the unit was not voluntarily formed. As noted by the court in Smith v. Carter Oil Co., supra, the lease sets forth the specific means by which a unit may be voluntarily formed and the mere application by the lessee for formation of a unit by the Commissioner would not meet the requirements of the lease.
It appears that there has been continuous production from one or more of the units since 1964. Thus, under the terms of the lease, the lease is still in effect over the entirety of the plaintiffs' tract.
Plaintiffs argue that the definition of the term "unit" was changed by the *943 enactment of the Louisiana Mineral Code in 1974 and would apply to either a compulsory or voluntary unit. Thus, the above cited jurisprudence would no longer be controlling. This argument is without merit.
The term "unit" as contained in Paragraph 6 cannot be considered in isolation and out of context. The emphasis in Paragraph 6 is clearly placed on the term "such pooled unit" and this term clearly refers only to a unit formed by action of the lessee in accordance with that paragraph.
Plaintiffs argue that the lease should be cancelled due to the failure of the lessee to furnish an instrument identifying and describing the pooled acreage.
As was set forth hereinabove, the lease provides the exclusive means by which a unit could be voluntarily formed. As the units in the instant case were formed under orders issued by the Commissioner of Conservation, defendants were not under an obligation to execute and record such a document. The evidence shows that there was never any utilization of the voluntary pooling provision in Paragraph 6 by a lessee, thus the provision never became applicable.
Plaintiffs argue that LSA-R.S. 31:114 is inapplicable to the instant case as the tract of land subject to the lease is contiguous rather than noncontiguous. This argument is without merit.
LSA-R.S. 31:114 provides as follows:
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. A single lease may be created on two or more noncontiguous tracts of land, and operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened.
The comments to LSA-R.S. 31:114 state that in providing that operations on the leased premises or land unitized therewith will preserve the lease in its entirety preserves established law which is based on the concept that the mineral lease is indivisible. See Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947), Le Blanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855 (1950) and Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957).
The comments note that the parties may provide for a result other than that contemplated by Article 114, which is frequently accomplished by the inclusion of a Pugh Clause in the lease. The inclusion of a Pugh Clause effectively reverses the decisions noted earlier, with the result that if there is unitization and production is obtained from the unit, the lease is maintained only as to that portion of the leased premises included within the unit. See Fremaux v. Buie, 212 So.2d 148 (La.App. 3d Cir.1968). However, the lessee may maintain the lease as to the remainder of the leased premises by any other means permitted by the lease such as delay rental payments, drilling or shut-in rentals.
As noted in the comments, LSA-R.S. 31:114 codified established law that operations on the leased premises or land unitized therewith will preserve the lease in its entirety. The provision that a single lease may be created on two or more noncontiguous tracts of land is a separate and distinct concept from the following phrase that operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue the lease in force as to the entirety of the land burdened. In other words, the two concepts contained in this sentence appear to be a descriptive listing of certain characteristics of a Louisiana mineral lease and are not limited solely to leases on noncontiguous tracts of land. Furthermore under the article, it would be unreasonable to find that operations on a contiguous tract of land would not act to maintain the lease whereas operations on noncontiguous tracts would.
Plaintiffs seek to distinguish Hunter Co. v. Shell Oil Co., supra, from the instant case. In Hunter Co. v. Shell Oil Co., supra, delay rentals were paid during the primary term to maintain the lease in effect and the order of the Commissioner of *944 Conservation provided that drilling and production of any of the tracts included within the unit would constitute drilling and production under the terms of the leases affecting the property included within the unit.
In the instant case, continuous production has been maintained from a portion of the leased acreage included within a unit since 1964. It is well established that delay rentals become due only during the primary term when the lease is not being held by the commencement of drilling operations or by production. As we have concluded that the operations and production on and from the units which included a portion of the leased premises was sufficient to maintain the lease over the entire tract, the payment of delay rentals by the lessee was not required.[3] Therefore, the alleged failure to make such payments is of no consequence.
Furthermore, all of the orders issued by the Commissioner of Conservation in the instant case provide that all operations on and production from each unit shall be considered operations on and production from each of the separate tracts within said unit and under the terms of each of the mineral leases affecting such tracts.
While this language is not identical to that contained in the order of the Commissioner which was examined in Hunter Co. v. Shell Oil Co., supra, it is substantially similar and certainly has the same effect.
Plaintiffs argue that the lease, at least as it pertains to the portion of the property located outside the first unit, expired for nonuse both as to the primary term and the ten year period set forth in LSA-R.S. 31:115. LSA-R.S. 31:115 provides in pertinent part as follows:
A. The interest of a mineral lessee is not subject to the prescription of nonuse, but the lease must have a term. Except as provided in this Article, a lease shall not be continued for a period of more than ten years without drilling or mining operations or production. Except as provided in this Article, if a mineral lease permits continuance for a period greater than ten years without drilling or mining operations or production, the period is reduced to ten years.
As we have concluded that the entire lease was maintained by production, LSA-R.S. 31:115 is not applicable.
Finally, plaintiffs argue that maintaining the lease in effect abrogates the provisions of LSA-R.S. 31:122 and the principle of reasonable development.
LSA-R.S. 31:122 provides as follows:
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
It appears that plaintiffs contend that maintenance of the lease as to the entire tract by virtue of production from only a portion of the tract included within a unit violates the principle of reasonable development.
The "... principle of reasonable development is a matter of public policy, necessary in order to give effect to the parties' intent inherent in all mineral leases, to assure reasonable development of the state's natural resources, and to prevent property being taken out of commerce." Dawes v. Hale, 421 So.2d 1208 (La.App. 2d Cir.1982) at 1211.
The concept of the indivisible nature of mineral leases and the effects thereof, as noted in Hunter Co. v. Shell Oil Co., supra, have existed in Louisiana jurisprudence for a number of years. There appears to be no justification at this time to hold that this concept somehow violates the *945 principle of reasonable development. Furthermore, it does not appear from the evidence that the defendants have been unreasonable in developing the plaintiffs' property.
For these reasons, the judgment of the trial court in favor of the defendants, Goodrich Oil Company, Grigsby Petroleum, Inc. and Arkansas Louisiana Gas Company, is affirmed at the costs of the plaintiffs, Lavada Gilbert Mathews, Alfred L. Mathews, Jr. and Emmett A. Mathews.
AFFIRMED.
NOTES
[1] On October 10, 1966, the Louisiana Department of Conservation issued Order No. 603-G which redesignated the Hosston "A" SU B unit as the Hoss "A-4" SU A. No change in the acreage covered by the unit was made and the F.P. McBride No. 1 Well was designated as the unit well.
[2] (A) Hoss "A-1" SU A, McBride No. 1 (Kimball Production Company, formerly Art Machin & Associates, Inc.)The Hoss "A-1" SU A unit was established by Order No. 603-D issued by the Louisiana Department of Conservation on October 10, 1966. This unit contains a portion of leased acreage. The well was spudded on November 29, 1968 and was completed in the Hosston "A-1" sand on January 6, 1969. The well produced until it was eventually abandoned in May, 1978.

(B) James Lime RA SU B, McBride No. 1 (Goodrich Oil Company)The James Lime RA SU B unit was established by the Louisiana Department of Conservation Order No. 603-H-1 on June 12, 1981 and includes a portion of the leased acreage. The well was spudded on April 16, 1981, and was completed in the James Lime, Reservoir A on May 22, 1981. The well continues to produce to date.
[3] Plaintiffs have neither alleged nor proven that there was a failure to pay delay rentals, if any became due, prior to the time operations were commenced or production was obtained in the first unit. In the absence of such allegations, it appears the lease was still in effect at the time of the first unitization and subsequent operations and production.